**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES ERIN MCKINNEY,
  *Petitioner-Appellant*,

v.

CHARLES L. RYAN,
  *Respondent-Appellee*.

No. 09-99018

D.C. No.
2:03-cv-00774-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted En Banc
December 15, 2014—Pasadena, California

Filed December 29, 2015

Before: Sidney R. Thomas, Chief Judge, and Alex
Kozinski, Kim McLane Wardlaw, William A. Fletcher,
Ronald M. Gould, Marsha S. Berzon, Richard C. Tallman,
Consuelo M. Callahan, Carlos T. Bea, Morgan Christen
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Bea

## SUMMARY[*]

### Habeas Corpus

The en banc court reversed the district court's judgment denying Arizona state prisoner James McKinney's petition for a writ of habeas corpus, remanded with instructions to grant the writ with respect to McKinney's death sentence unless the state, within a reasonable time, corrects the constitutional error in his death sentence or vacates the sentence and imposes a lesser sentence consistent with law.

The en banc court overruled *Schad v. Ryan*, 671 F.3d 708 (9th Cir. 2011) (per curiam), which prohibited an assumption of unconstitutionality under *Eddings v. Oklahoma*, 455 U.S. 104 (1982), absent a clear indication in the record that the state court applied the wrong standard.

The en banc court held that the Arizona Supreme Court applied an unconstitutional causal nexus test to McKinney's post-traumatic stress disorder—refusing, as a matter of law, to treat it as a relevant nonstatutory mitigating factor—contrary to clearly established federal law as established in *Eddings*.

The en banc court held that *Eddings* error is not structural error, but that the *Eddings* error in this case had a substantial and injurious effect on McKinney's sentence within the meaning of *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Bea, joined by Judges Kozinski, Gould, Tallman, and Callahan, dissented. He wrote that the majority ignores Supreme Court precedent, implicitly overrules this court's precedent, replaces AEDPA's deferential standard of review with an impermissible de novo standard, misstates the record, wrongly smears the Arizona Supreme Court, calls into question every death sentence imposed in Arizona between 1989 and 2005 and this court's cases that have denied habeas relief as to those sentences, and brushes by the facts of McKinney's gruesome crimes to find that the error the majority has manufactured was prejudicial.

## COUNSEL

Ivan K. Mathew (argued) and Susan Turner Mathew, Mathew and Associates, Phoenix, Arizona, for Petitioner-Appellant.

Jon Anderson (argued) and Jeffrey A. Zick, Assistant Attorneys General, Terry Goddard, Attorney General, and Kent Cattani, Chief Counsel, Arizona Attorney General's Office, Criminal Appeals/Capital Litigation Section, Phoenix, Arizona, for Respondent-Appellee.

Michael L. Burke and Robin Konrad, Assistant Federal Public Defenders, Jon M. Sands, Federal Public Defender, Federal Public Defender's Office, Phoenix, Arizona, for Amicus Curiae Office of the Federal Public Defender.

## OPINION

W. FLETCHER, Circuit Judge:

Petitioner James McKinney was sentenced to death, and his sentence was affirmed by the Arizona Supreme Court on *de novo* review in 1996. *State v. McKinney*, 917 P.2d 1214 (Ariz. 1996). A three-judge panel of this court denied McKinney's petition for a writ of habeas corpus. *McKinney v. Ryan*, 730 F.3d 903 (9th Cir. 2013). We granted rehearing en banc and withdrew our three-judge panel opinion. *McKinney v. Ryan*, 745 F.3d 963 (9th Cir. 2014). In his federal habeas petition, McKinney challenges both his conviction and sentence. We agree with the decision of the three-judge panel with respect to McKinney's challenges to his conviction, and to that extent we incorporate the decision of the panel. We address in this opinion only McKinney's challenge to his death sentence. For the reasons that follow, we grant the petition with respect to his sentence.

In *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), the Supreme Court held under the Eighth and Fourteenth Amendments that a sentencer in a capital case may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence" offered by the defendant. (Emphasis in original.) Oklahoma state courts had refused, as a matter of law, to treat as relevant mitigating evidence a capital defendant's background of family violence, including beatings by his father, on the ground that "it did not tend to provide a legal excuse from criminal responsibility." *Id.* at 113. The Supreme Court reversed. Recognizing the special character of the death penalty, the Court held that evidence of Eddings's background of family violence had to be treated as relevant evidence in determining whether to put him to death.

The Court wrote, "The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114–15.

At all times relevant to this case, Arizona law provided for two kinds of mitigation factors in capital sentencing — statutory and nonstatutory. A nonexhaustive list of five statutory mitigating factors was provided in Ariz. Rev. Stat. Ann. § 13-703(G). Arizona case law applied, in addition, nonstatutory mitigating factors, such as a difficult family background or a mental condition not severe enough to qualify as a statutory mitigating factor.

For a period of a little over 15 years in capital cases, in clear violation of *Eddings*, the Supreme Court of Arizona articulated and applied a "causal nexus" test for nonstatutory mitigation that forbade as a matter of law giving weight to mitigating evidence, such as family background or mental condition, unless the background or mental condition was causally connected to the crime. In *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989), decided seven years after *Eddings* and four years before petitioner was sentenced, the Arizona Supreme Court wrote, "A difficult family background, in and of itself, is not a mitigating circumstance. . . . A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control." In *State v. Ross*, 886 P.2d 1354, 1363 (Ariz. 1994), decided one year after petitioner was sentenced but before his sentence was affirmed on appeal, the Arizona Supreme Court wrote, citing the precise page in *Wallace*, "A difficult family background

is not a relevant mitigating circumstance unless 'a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control.' *State v. Wallace*, . . . 773 P.2d 983, 986 (1989)."

Two years after its decision in *Ross*, the Arizona Supreme Court affirmed McKinney's death sentence. In addressing the potential mitigating effect of his mental condition, the Court wrote that McKinney's PTSD had no causal nexus to his crimes. If anything, the Court wrote, "the effects of [his] childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD)" would have influenced him *not* to commit the crimes. *McKinney*, 917 P.2d at 1234. The Court concluded its analysis of McKinney's PTSD, citing the precise page in *Ross* on which it had articulated the causal nexus test for nonstatutory mitigation: "[A] difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant's ability to perceive, comprehend, or control his actions. *See State v. Ross*, . . . 886 P.2d 1354, 1363 (1994)." *State v. McKinney*, 917 P.2d 1214, 1234 (Ariz. 1996).

For just over fifteen years, the Arizona Supreme Court consistently articulated and applied its causal nexus test, in accordance with its strong view of stare decisis. *See Young v. Beck*, 251 P.3d 380, 385 (Ariz. 2011) ("[S]tare decisis commands that 'precedents of the court should not be lightly overruled,' and mere disagreement with those who preceded us is not enough." (quoting *State v. Salazar*, 173 Ariz. 399, 416 . . . (1992))); *State ex re. Woods v. Cohen*, 844 P.2d 1147, 1148 (Ariz. 1993) (referring to "a healthy respect for stare decisis"); *State v. Williker*, 491 P.2d 465, 468 (Ariz. 1971) (referring to "a proper respect for the theory of stare

decisis"); *White v. Bateman*, 358 P.2d 712, 714 (Ariz. 1961) (prior case law "should be adhered to unless the reasons of the prior decisions have ceased to exist or the prior decision was clearly erroneous or manifestly wrong").

The case before us is unusual. In federal habeas cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we apply a "presumption that state courts know and follow the law" and accordingly give state-court decisions "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). If the Arizona Supreme Court during the relevant period had been inconsistent in its articulation and application of its unconstitutional "causal nexus" test for nonstatutory mitigation, we would give the Court the benefit of the doubt and would accord it the presumption that it knew and followed governing federal law. But the Arizona Supreme Court's consistent articulation and application of its causal nexus test, and its citation in McKinney's case to the specific page of *Ross* on which it articulated the test, make such a course impossible. While *Visciotti*'s presumption is appropriate in the great majority of habeas cases, the presumption is rebutted here where we know, based on its own words, that the Arizona Supreme Court did not "know and follow" federal law.

The precise question before us is whether the Arizona Supreme Court applied its unconstitutional "causal nexus" test in affirming McKinney's death sentence on *de novo* review. We must decide whether, under AEDPA, the Arizona Supreme Court refused to give weight, as a matter of law, to McKinney's nonstatutory mitigation evidence of PTSD, "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the reasons that follow, we

conclude that it did. We therefore grant the writ with respect to petitioner's sentence.

## I. McKinney's Crimes, Conviction, and Sentence

James McKinney and his older half brother, Charles Michael Hedlund, committed two burglaries in February and March of 1991. One person was shot and killed during each of the burglaries. At the time of the crimes, McKinney was 23 years old. Hedlund was 26 years old. McKinney and Hedlund had learned about potential burglary targets from their half brother, Christopher Morris, and a friend, Joe Lemon, who had suggested Christine Mertens's home as a target. The four of them attempted to burglarize Ms. Mertens's home on February 28, 1991, but Ms. Mertens came home and they left to avoid detection. The three half brothers, McKinney, Hedlund, and Morris, then committed two burglaries at other locations the following day.

McKinney, Hedlund, and possibly Morris went back to Ms. Mertens's house a little over a week later, on March 9, 1991. This time, Ms. Mertens was already at home. She was beaten and stabbed by one or more of the burglars. One of the burglars held Ms. Mertens down on the floor and shot her in the back of the head with a handgun, covering the gun with a pillow. (Morris turned state's evidence and testified against McKinney and Hedlund. He testified that he was at work at Burger King on the night of the Mertens murder, but Burger King had no record of him working that night.) McKinney and Hedlund later tried unsuccessfully to sell the gun. They ultimately disposed of the gun by burying it in the desert. Not quite two weeks later, on March 22, 1991, McKinney and Hedlund burglarized the home of Jim McClain, from whom Hedlund had bought a car several months earlier. Mr.

McClain was asleep in the bedroom. He was shot in the back of the head by either McKinney or Hedlund. The bullet was consistent with having been fired from a sawed-off rifle owned by Hedlund.

McKinney and Hedlund were tried together before dual juries for the burglaries and homicides. McKinney's jury found him guilty of two first degree murders. Hedlund's jury found him guilty of second degree murder of Ms. Mertens and first degree murder of Mr. McClain. On July 23, 1993, the trial judge sentenced McKinney to death. The Supreme Court decision holding judge-sentencing in capital cases unconstitutional was nine years in the future. *See Ring v. Arizona*, 536 U.S. 584 (2002). In the last reasoned state court decision, the Arizona Supreme Court, reviewing *de novo*, affirmed McKinney's conviction and sentence in 1996. *McKinney*, 917 P.2d 1214. We describe the Arizona Supreme Court's sentencing decision at greater length below. McKinney filed for state post-conviction relief. His petition was denied by the trial court without an evidentiary hearing. The Arizona Supreme Court then summarily denied his petition for review.

## II. McKinney's Family Background

McKinney suffered a traumatic childhood characterized by severe physical and psychological abuse, both by his biological parents, James McKinney, Sr. ("James") and Bobbie Jean Morris, and by his stepmother, Shirley Crow McKinney. At McKinney's sentencing hearing, his aunt (his father's sister), Susan Sesate, and his younger sister, Diana McKinney, described the abuse.

Susan and Diana both testified about the squalid conditions in which McKinney lived as a child. Susan testified that while McKinney's parents, James and Bobbie, were still married, their house was filthy. She testified, "[W]hen you walked through the door, it wasn't nothing to see, you know, diapers full of — all around. . . . Everything stunk." James was an alcoholic, and Bobbie left him when McKinney was about three years old.

When Bobbie left James, she took with her their three children, Diana, Donna, and McKinney. Susan testified, "She ran with them. . . . She ran to a lot of different states. I know she went to California first and Kansas twice. California again. I know she went through Texas, New Mexico." James pursued and brought Bobbie and the children back to Arizona, but "she would run again." "As soon as he brought her back, within a week she'd be gone again to Kansas. She had the kids there." James told McKinney's presentence investigator that Bobbie had "kidnapped" the children, and that he took them back "after he found out they were being physically abused and were being locked in closets, hungry and sick."

Bobbie eventually left James for good, and he got remarried. James got custody of the children and brought them to Arizona to live with him and his new wife Shirley. The conditions in the house with James and Shirley were even worse than they had been with James and Bobbie. Susan, a teenager at the time, lived with her mother (who was also James's mother) in a house nearby. She was at the McKinney house frequently. Susan testified that the house "was gross. It was gross. I mean, the house was filthy, the kids were filthy, they never had clean clothes that I ever saw

them in. If they had clothes, they were ill-fitting clothes. I mean, it was disgusting."

McKinney, his two sisters, and his older half brother Hedlund (Bobbie's son by a different father) shared one small bedroom. Shirley's daughter had a bedroom to herself. Susan testified that the floor of the four children's bedroom was always covered with dirty clothes because there were no bureaus and no hangers for the closet. There were no sheets on the beds. The children had to share their room with animals Shirley brought home, including dogs, cats, a goat, snakes, and a monkey. The animals regularly defecated and urinated in the bedroom. Diana testified that the adults never cleaned the bedroom.

Diana was 18 months old when James took the children from Bobbie and brought them to the Arizona house he shared with his new wife Shirley. Donna was three, McKinney was four or five, and Hedlund was seven. Diana and Susan testified that the four children were responsible for all general household cooking and cleaning, including cleaning up the animal feces and urine that were "all over" the house; feeding farm animals, including cows, pigs, and goats; taking care of James's hunting dogs; doing all of their own laundry; and sometimes doing Shirley's laundry. Diana testified that she and the other children cleaned the house the best they could, but "the house still smell[ed]" all the time. Susan testified, "It was nothing to see James [Jr.] and Michael [Hedlund] standing on chairs at the stove cooking or having to stand on chairs to do the dishes" because they were too small to reach the stove and the counters. Shirley's daughter did not have to do any chores. Shirley kept the children from attending school as punishment for various supposed infractions. Susan testified that on one occasion McKinney

sat on the porch for three days while the others went to school. When Susan's mother (McKinney's grandmother) sent Susan over to investigate, McKinney told her that Shirley would not allow him to go to school unless Bobbie bought him a new pair of tennis shoes. Susan's mother bought McKinney shoes so he could return to school.

The children never had regular baths and often had dirty hair. When the children went to school, they wore dirty clothes that reeked of urine from being on the bedroom floor with the animals. The children's school sent letters home about their appearance and odor. They were regularly harassed and teased by other children. McKinney was frequently suspended for fighting on the school bus because other children made fun of his appearance and odor.

The four children suffered regular and extensive physical, verbal, and emotional abuse. Minor infractions of Shirley's rules, such as not doing the dishes properly, resulted in beatings. Diana testified that she could not recall a time when none of the children had a welt or bruise inflicted by Shirley. Susan testified, "They had bruises all the time. It was hard to tell what were new bruises and what weren't." Shirley used plastic switches, cords, belts, and a hose to hit them— "anything she could get in her hands." Diana estimated that McKinney was beaten two to three times a week. Susan testified to repeated serious beatings, including one particular beating with

> [a] water hose. It was about a yard long like
> that (indicating), and she had like a pocket
> knife, and she snipped the hose and she went
> after him. She beat him on the back of the
> head, down his back, all over his legs, his

> arms; anything that moved, she hit him. . . .
> He had bruises for weeks after that all over
> him. . . . Michael Hedlund tried to stop her.
> He grabbed her arm, and so she swung back
> and hit him across the side of the face and
> bruised his face.

Hedlund left the house to live with his mother when he was 14 years old. This left McKinney, approximately age 11, as the only boy and the oldest of the three remaining children. McKinney was too young to protect either himself or his younger sisters. Diana, the younger of the two girls, described their childhood experience as "horrible. It was scary. It seems like we were all stressed out wondering when the next time we were getting beat; wondering when we were going to eat next."

Shirley's physical abuse was accompanied by verbal and emotional abuse. Diana testified that Shirley regularly yelled at them, telling them that they were "[s]tupid, ugly, [and] not worth anything." Diana testified that Shirley showed consistent favoritism toward her own daughter, while treating her stepchildren as the "four bad kids."

Shirley often locked the children out of the house for hours without food and, sometimes, water. There was a hose in the yard, but Susan testified that if Shirley "was really angry at them, they couldn't turn the water faucet on outside and even get a drink of water, and it would be 110 degrees outside." Susan remembered one occasion seeing the four children outside on a hot Arizona summer day, clustered in the shade of an eave of the house. None of the children had shoes; the girls were wearing only underwear, and the boys were wearing cutoff shorts with no shirts. When Susan and

her mother returned to their house four hours later in the middle of the afternoon, the children were still there, their faces "beet red." They told her that they were not allowed to get any water and could not come back inside until their father got home, when he would "punish them." On another occasion, Susan testified, Shirley "pick[ed] James [Jr.] up by the scruff of the neck" and put him out on the porch with no shoes or coat during the winter, when the frozen grass "would crunch under your feet."

Shirley spent most of her time at home, while James was generally absent. When he was home, James drank heavily. Susan testified that James's mother confronted him about Shirley's physical abuse of the children, but he told her to "keep her nose out of his business." Susan testified to an incident in which McKinney, who was in first or second grade at the time, had stolen a lunch at school because Shirley and James had not given him any lunch money. McKinney was suspended for several days. James told his son that "he wasn't going to punish him for stealing lunch; he was going to punish him for getting caught."

By age nine or 10, McKinney had become distant, quiet and withdrawn. He avoided other children. He began using alcohol and marijuana at age 11. He dropped out of school in the seventh grade. At about this time, he began running away from home. Diana testified that McKinney ran away four or five times. Susan remembered one incident in which, at age 11, McKinney showed up unannounced at her house in Gilbert, Arizona after traveling alone from Oklahoma, where the family had moved. McKinney had taken a bus as far as Flagstaff, but did not have enough money to go farther. He spent the next two days hitchhiking the rest of the way to Susan's house. McKinney's arm, shoulder, and face were

bruised; he told Susan he had gotten into a fight with Shirley. Susan called his mother Bobbie on the telephone to tell her that McKinney was at her house and that he was dirty and tired, and hadn't eaten in days. Bobbie did not come over to pick him up. She called the sheriff instead, who picked up McKinney and put him in juvenile detention.

### III. McKinney's Post-traumatic Stress Disorder

Dr. Mickey McMahon, a psychologist, made a formal diagnosis of PTSD resulting from the horrific childhood McKinney had suffered. Before arriving at his diagnosis, Dr. McMahon had spent eight and a half hours with McKinney, talking to him and administering a battery of tests. He had also spoken with Susan for an hour and with Diana for half an hour. Finally, Dr. McMahon had listened to Susan and Diana's testimony in court before providing his own testimony. When asked, "[D]o you have any doubts about your diagnosis of James McKinney having Post-traumatic Stress Disorder?" Dr. McMahon answered, "No. None."

Dr. McMahon testified that his diagnosis of PTSD rested not only on the abuse that McKinney himself had suffered. He testified, "We know in research that witnessing can be even more damaging than actually being the recipient of abuse. . . . [T]here is a helplessness that is involved when you're witnessing . . . violence and you're too small to do anything about it." When asked whether "violence upon his sisters and brother would be . . . more traumatic to him possibly than himself," Dr. McMahon answered, "Yes." Dr. McMahon testified that his interview with McKinney "had gone into great depth about him witnessing Dian[]a being abused and beaten by her stepmother."

Dr. McMahon testified that McKinney's PTSD was characterized by "flashbacks," by "some sort of voidness, numbing, withdrawing," and by "substance abuse." The substances were "generally downers, opiates in prison, alcohol, marijuana." Dr. McMahon characterized McKinney as "basically passive," "quite submissive," and "susceptible to manipulation, exploitation." "He can be emotionally overwhelmed by environmental stress and act in poorly-judged ways just to [re]duce the internal emotional turmoil." "He does not present [i]n the testing [as someone] who is . . . manipulative, sensation- or thrill-seeking, and we know often that people that get involved with violent kinds of crime are thrill-seeking sociopaths. These results do not look like that. It looks the opposite of that, since these tests are pretty much consistent. He is a lo[]ner; depressed."

When asked whether someone with PTSD would "suffer . . . constantly" from it, or whether it "may rear its head under certain situations," Dr. McMahon responded that for someone with PTSD "there is the potential for the trauma to be re-triggered, if things happen that are similar to what happened when you're originally traumatized." When asked about the Mertens burglary and murder, Dr. McMahon testified that if an altercation had taken place between Ms. Mertens and another person (not necessarily McKinney), it could "very possib[ly]" have "re-triggered" McKinney's trauma and could have produced "diminished capacity."

When asked about the McClain burglary and murder, Dr. McMahon testified that it would have been very uncharacteristic of McKinney to have shot a sleeping person. "Mr. McKinney's test[] results, in the more than eight hours I spent with him, did not indicate that he was that thrill-seeking kind of, execution-kind of person. He'd rather

withdraw from the situation." Shooting a sleeping person "would be the exact opposite of what I would expect from Mr. McKinney."

Dr. Steven Gray, also a psychologist, testified for the prosecution. In preparation for his testimony, Dr. Gray had reviewed two presentence reports, a report prepared by Dr. McMahon, the raw data and results of tests performed by Dr. McMahon, and McKinney's school records. He had also interviewed McKinney in jail, in the company of one of his lawyers, for "an hour, hour-and-a-half." Dr. Gray had not spoken with Susan, Diana, or other family members. Dr. Gray testified, "I don't think there's enough evidence or diagnostic materials or work that's been done to conclusively diagnose [McKinney] as having Post-traumatic Stress Disorder." Dr. Gray's "tentative or provisional diagnosis" was "Antisocial Personality Disorder."

## IV.  Sentencing

The verdict forms submitted to McKinney's and Hedlund's juries asked only for general verdicts. The prosecutor had argued to the juries that they could find McKinney and Hedlund guilty of first degree murder either because they were guilty of actually killing Ms. Mertens or Mr. McClain, or because they were guilty of felony murder. At McKinney's sentencing hearing, the judge indicated that he believed that McKinney had shot Ms. Mertens and that Hedlund had shot Mr. McClain. But the judge recognized that the jury had not specifically found that McKinney had shot Ms. Mertens. The judge therefore relied on *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), to conclude that even if McKinney had not killed either Ms. Mertens or Mr. McClain, his involvement in the

crimes leading up their murders nevertheless made him death-eligible. He said with respect to the murder of Ms. Mertens, "[E]ven if [Helund] had committed the homicide of Mrs. Mertens, [McKinney] knew that [Hedlund] at the time of entering the McClain residence was capable of killing."

When McKinney was sentenced, Arizona provided by statute a nonexhaustive list of five specific mitigating factors. *See* Ariz. Rev. Stat. Ann. § 13-703(G) (1993). Among the statutory mitigators was a modified form of diminished capacity, contained in § 13-703(G)(1): "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

Arizona law also provided for nonstatutory mitigating factors, such as family background or mental conditions that did not rise to the level of impairment specified in § 13-703(G)(1). For a little over fifteen years, from the late 1980s until 2006, Arizona Supreme Court applied a "causal nexus" test to nonstatutory mitigation factors. Under this test, evidence of a difficult family background or mental disorder was not in and of itself a relevant nonstatutory mitigating factor. As a matter of Arizona law, such evidence was relevant for nonstatutory mitigation only if it had a causal effect on the defendant's behavior in the commission of the crime at issue. Application of the causal nexus test to nonstatutory mitigation factors violated *Eddings*, for it resulted in Arizona courts being entirely forbidden, as a matter of state law, to treat as a mitigating factor a family background or a mental condition that was not causally connected to a defendant's crime.

The trial judge sentenced McKinney to death. The judge weighed what he concluded were legally relevant aggravating and mitigating circumstances. He stated that "with respect to mitigation" he "considered" the exhibits that were admitted into evidence, and that he "did take . . . into consideration" the testimony of Susan Sestate, Diana McKinney, and Dr. McMahon. He stated as to McKinney's family history, "I agree that there was evidence of a difficult family history by the defendant. However, as I've indicated, I do not find that [it] is a substantial mitigating factor . . . ."

The judge accepted Dr. McMahon's PTSD diagnosis, but concluded that it was not causally connected to McKinney's criminal behavior. Twice the judge specifically addressed the relevance of McKinney's PTSD as a potential mitigating factor. Although the judge did not expressly so state, it appears (and we are willing to assume) that he was speaking both times in the context of statutory mitigation under § 13-703(G)(1). The judge gave McKinney's PTSD no weight as a mitigating factor.

The judge stated:

> But I think more importantly than that, certainly not trying to dispute him as an expert on what all that meant, it appeared to me that Dr. McMahon did not at any time suggest in his testimony nor did I find any credible evidence to suggest that, even if the diagnosis of Post-traumatic Stress Syndrome were accurate in Mr. McKinney's case, *that [it] in any way significantly impaired Mr. McKinney's conduct.*

(Emphasis added.) He stated a short time (two transcript paragraphs) later:

> [I]t appeared to me that based upon all these circumstances that there simply was no substantial reason to believe that even if the trauma that Mr. McKinney had suffered in childhood had contributed to an appropriate diagnosis of Post-traumatic Stress Syndrome *that it in any way affected his conduct in this case.*

(Emphasis added.) Nowhere else in his sentencing colloquy did the judge specifically refer to McKinney's PTSD and its possible mitigating effect.

The italicized language in two paragraphs just quoted echoes the causal nexus test of the statutory mitigating factor in § 13-703(G)(1). When applied solely in the context of statutory mitigation under § 13-703(G)(1), the causal nexus test does not violate *Eddings*. However, the italicized language also echoes the restrictive language of Arizona's causal nexus test applicable to nonstatutory mitigation. When applied in the context of nonstatutory mitigation, the causal nexus test clearly violates *Eddings*.

The Arizona Supreme Court reviews capital sentences *de novo*, making its own determination of what constitute legally relevant aggravating and mitigating factors, and then independently weighing those factors. Ariz. Rev. Stat. Ann. § 13-755; *see also McKinney*, 917 P.2d at 1225. The Arizona Supreme Court affirmed McKinney's death sentence. The Court addressed "the effects of [McKinney's] childhood, specifically the diagnosis of post-traumatic stress disorder

(PTSD)." *Id.* at 1234. The Court agreed with the trial judge that there was no causal nexus between McKinney's PTSD and his crimes. Indeed, the Court went further, finding that McKinney's PTSD would have influenced him *not* to commit his crimes.

In sentencing McKinney to death, the Arizona Supreme Court gave no weight to McKinney's PTSD. It made no reference to statutory mitigation under § 13-703(G)(1). Instead, the Court recited its unconstitutional causal nexus test applicable to nonstatutory mitigation, citing the specific page of *Ross* on which it had articulated that test two years earlier. The Court wrote:

> [T]he record shows that the judge gave full consideration to McKinney's childhood and the expert testimony regarding *the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD)*. Assuming the diagnoses were correct, the judge found that none of the experts testified to, and none of the evidence showed, that such conditions in any way impaired McKinney's ability to conform his conduct to the law. The judge noted that McKinney was competent enough to have engaged in extensive and detailed preplanning of the crimes. McKinney's expert testified that persons with PTSD tended to avoid engaging in stressful situations, such as these burglaries and murders, which are likely to trigger symptoms of the syndrome. The judge observed that McKinney's conduct in engaging in the crimes was counter to the behavior

> McKinney's expert described as expected for
> people with PTSD. . . . [*A*] *difficult family
> background, including childhood abuse, does
> not necessarily have substantial mitigating
> weight absent a showing that it significantly
> affected or impacted the defendant's ability to
> perceive, comprehend, or control his actions.
> See State v. Ross*, 180 Ariz. 598, 607,
> 886 P.2d 1354, 1363 (1994)[.]

*McKinney*, 917 P.2d at 1234 (emphasis added).

## V. Deference under AEDPA

McKinney's appeal is governed by AEDPA.
Accordingly, we will not grant his petition for a writ of
habeas corpus unless the state's adjudication of his claim

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of,
> clearly established Federal law, as determined
> by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d). We review de novo the district court's
decision whether to grant McKinney's habeas petition. *Dyer
v. Hornbeck*, 706 F.3d 1134, 1137 (9th Cir. 2013).

Under the "contrary to" prong of § 2254(d)(1), a federal
court may grant habeas relief only "if the state court arrives

at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong, a federal court may grant relief only if "the state court's application of clearly established federal law was objectively unreasonable," *id.* at 409, such that "fairminded jurists could [not] disagree that" the arguments or theories that supported the state court's decision were "inconsistent with the holding in a prior decision of [the Supreme] Court," *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (internal quotation marks omitted).

For purposes of habeas review, we review the state court's "last reasoned decision." *Dyer*, 706 F.3d at 1137. We apply a "presumption that state courts know and follow the law." *Visciotti*, 537 U.S. at 24. "[Section] 2254(d)'s 'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Id.* We "are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation." *Bell v. Cone*, 543 U.S. 447, 455 (2005); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) ("[AEDPA] does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). We should neither engage in hyper-technical analysis nor require "formulary statement[s]" that ignore "the fair import of the [state court's] opinion." *Packer*, 537 U.S. at 9. Our task is to determine what standard the state court actually applied to resolve the petitioner's claim. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012).

VI.  Clearly Established Law as Determined by the
Supreme Court

The Supreme Court in *Lockett v. Ohio*, 438 U.S. 586
(1978), and in *Eddings* established a clear rule governing the
role of mitigating evidence in capital sentencing.  In *Lockett*,
Chief Justice Burger wrote a plurality opinion concluding that
Ohio's death penalty statute was invalid because it restricted
the mitigating circumstances that could be considered by the
sentencer.  The plurality concluded that under the Eighth and
Fourteenth Amendments, "the sentencer . . . [must] not be
precluded from considering, *as a mitigating factor*, any aspect
of a defendant's character or record and any of the
circumstances of the offense that the defendant proffers as a
basis for a sentence less than death" because a rule preventing
"the sentencer in all capital cases from giving independent
mitigating weight to aspects of the defendant's character and
to circumstances of the offense proffered in mitigation creates
the risk that the death penalty will be imposed in spite of
factors which may call for a less severe penalty."  438 U.S. at
604–05 (emphasis in original).

Four years later, in *Eddings*, the Court applied the
principle articulated in Chief Justice Burger's opinion in
*Lockett*.  In *Eddings*, the sentencing judge had refused to
consider evidence that Eddings had been raised in turbulent
homes without supervision, had witnessed his mother's
substance abuse, and had been beaten by his father.  After
"weigh[ing] the evidence of aggravating and mitigating
circumstances," the sentencing judge concluded that he could
not, "in following the law . . . consider the fact of this young
man's violent background."  455 U.S. at 108–09.  Although
the state appeals court acknowledged Eddings's family
history and psychological and emotional disorders, it upheld

his conviction because "all the evidence tends to show that [Eddings] knew the difference between right and wrong at the time he pulled the trigger, and that is the test of criminal responsibility in this State." *Id.* at 109–10. The Supreme Court endorsed the plurality opinion in *Lockett* and held that

> [j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. . . . The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Id.* at 113–15 (emphasis in original).

The United States Supreme Court interpreted and applied the *Lockett*/*Eddings* rule in several other decisions prior to McKinney's sentencing in 1993 and the Arizona Supreme Court's affirmance in 1996. In those decisions, the Court reiterated its holding that the admission of relevant evidence is not enough to satisfy the Eighth and Fourteenth Amendments if the sentencer is prevented by state law from giving effect to that evidence. Because "full consideration of evidence that mitigates against the death penalty is essential if the [sentencer] is to give a 'reasoned *moral* response to the defendant's background, character, and crime,'" *Eddings* requires that "[t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Penry v. Lynaugh* (*Penry I*), 492 U.S. 302, 319, 328 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S.

304 (2002) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 184 (1988) (O'Connor, J., concurring in the judgment)). "[T]he State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987); *see also Skipper v. South Carolina*, 476 U.S. 1, 4–5 (1986) (holding that even where mitigating evidence does "not relate specifically to . . . [the defendant's] culpability for the crime he committed," the defendant is entitled to offer any evidence that "would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death'" (quoting *Lockett*, 438 U.S. at 604)).

VII.   The Causal Nexus Test and Its Application Here

A.   Arizona's Test

The trial judge sentenced McKinney to death in 1993. The Arizona Supreme Court affirmed Kinney's conviction and sentence in 1996.

As briefly described above, Arizona capital sentencing law included a statutorily specified nonexhaustive list of five mitigating factors. *See* Ariz. Rev. Stat. Ann. § 13-703(G) (1993). Among the statutory mitigating factors was a modified form of diminished capacity, contained in § 13-703(G)(1): "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

Arizona capital sentencing law also included nonstatutory mitigating factors, such as family background or mental conditions that did not rise to the level of impairment

specified in § 13-703(G)(1). Beginning in the late 1980s, Arizona Supreme Court developed a "causal nexus" test for nonstatutory mitigation. Under this test, as we noted above, evidence of a difficult family background or a mental condition was not in and of itself relevant mitigating evidence. As a matter of Arizona law, such evidence was relevant for mitigation purposes only if it had some causal effect contributing to the defendant's behavior in the commission of the crime at issue. Thus, while the defendant could submit evidence of his difficult family background or mental condition, the sentencing court was prohibited from treating it as legally relevant mitigation evidence unless the defendant proved a causal connection between his background or disorder and the crime. In capital cases from the late 1980s to the mid-2000s, the Arizona Supreme Court repeatedly articulated this causal nexus test for nonstatutory mitigation. The test was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" in *Eddings*.

In the immediate aftermath of *Eddings*, the Arizona Supreme Court had not yet developed its causal nexus test for nonstatutory mitigation. One year after *Eddings*, the Arizona Supreme Court understood and applied *Eddings* and *Lockett* correctly. In *State v. McMurtrey*, a capital case, the Court wrote:

> [T]he sentencer may not refuse to consider, as a matter of law, relevant evidence presented in mitigation. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). . . .
>
> . . . If after considering the offered evidence, the court concludes that with

respect to the defendant's mental condition, it merely establishes a character or personality disorder then the court may under [*State v.*] *Richmond*, [560 P.2d 41 (Ariz. 1976),] conclude that the mitigating circumstance in [Ariz. Rev. Stat. Ann.] § 13-703(G)(1) does not exist.   In order to remain faithful to *Lockett* and [*State v.*] *Watson*, [586 P.2d 1253 (Ariz. 1978),] however, the court's inquiry may not end there.   The court must consider the offered evidence further to determine whether it in some other way suggests that the defendant should be treated with leniency.

664 P.2d 637, 646 (Ariz. 1983); s*ee also State v. Gretzler*, 659 P.2d 1, 14 (Ariz. 1983).

By the late 1980s, however, the Arizona Supreme Court had begun to articulate and apply its causal nexus test to nonstatutory mitigation.  In *Wallace*, decided three years before the trial judge sentenced McKinney, the Arizona Supreme Court wrote in a capital case:

> *A difficult family background, in and of itself, is not a mitigating circumstance.* If it were, nearly every defendant could point to some circumstance in his or her background that would call for mitigation.  A difficult family background *is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control. . . .* [Appellant's] entire family background was before the court in the

pre-sentence report. *Appellant, however, made no claim that his family background had anything to do with the murders he committed.*

*Wallace*, 773 P.2d at 986 (1989) (emphasis added). The Court could not have been clearer that, *as a matter of law*, nonstatutory mitigation evidence not satisfying the causal nexus test was irrelevant. This test was in direct contravention of *Eddings* and *Lockett*.

In *Ross*, decided two years after the trial judge sentenced McKinney, the Arizona Supreme Court wrote in another capital case, with a pin citation to the precise page in *Wallace*:

A difficult family background *is not a relevant mitigating circumstance unless* "a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control." *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989).

886 P.2d at 1363 (1994) (citation shortened) (emphasis added). Again, the Court could not have been clearer that, *as a matter of law*, nonstatutory mitigation evidence not satisfying the causal nexus test was irrelevant. In affirming McKinney's death sentence in 1996, the Arizona Supreme Court cited *Ross*, with a pin citation to this precise page. *McKinney*, 917 P.2d at 1234.

Two years after affirming McKinney's death sentence, the Arizona Supreme Court mentioned *Eddings* by name, in a passage manifesting its continued misreading of *Eddings* and

*Lockett*. In *State v. Djerf*, 959 P.2d 1274, 1289 (Ariz. 1998), the Arizona Supreme Court explained that it read *Eddings* and *Lockett* to require a sentencer to "consider" evidence offered in mitigation. In the usage of the Arizona Court, however, "considering" such evidence did not mean weighing it to determine how much mitigating effect to give it. Rather, it meant "considering" such evidence to determine whether it satisfied the causal nexus test for nonstatutory mitigation. If it satisfied the test, the sentencer was required to determine how much weight, if any, to give it. If did not satisfy the test, the sentencer was required, as a matter of law, to treat it as irrelevant and to give it no weight. As the Court wrote in *Djerf*:

> This court has held that *Lockett* and *Eddings* require only that the sentencer *consider* evidence proffered for mitigation. The sentencer, however, is entitled to give it the weight it deserves. *Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior. Ross*, 886 P.2d at 1362. The trial court *considered* the evidence *but found it irrelevant and declined to give it weight* because proof was lacking that his family background had any effect on the crimes.

*Id.* (emphasis added and some citations omitted).

Two years later, in *State v. Hoskins*, the Arizona Supreme Court reiterated what it had written in *Djerf* and explained the Arizona causal nexus test and its two-step process for

"consideration" of mitigating evidence. The Court wrote at length:

> The trial court found that defendant had shown by a preponderance of the evidence that he suffered from antisocial or borderline personality disorder. But proof that such disorder exists does not of itself establish mitigation. For our purposes on review, it is essential not only that a personality disorder be shown to exist but that it be causally linked to the crime at the time the crime is committed.
>
> . . .
>
> A dysfunctional family background or difficult childhood can be mitigating only if the defendant can establish that early experiences, however negative, affected later criminal behavior in ways that were beyond his control. Thus, family dysfunction, as with mental impairment under the (G)(1) statute, can be mitigating only when actual causation is demonstrated between early abuses suffered and the defendant's subsequent acts. We reaffirm that doctrine here. . . .
>
> . . . *If the defendant fails to prove causation, the circumstance will not be considered mitigating. However, if the defendant proves the causal link, the court will then determine what, if any, weight to accord the circumstance in mitigation.*

. . . .

The dissenting opinion expresses an impassioned description of the defendant's "horrific" childhood.  We are aware of the circumstances of defendant's upbringing and have reviewed all aspects in minute detail. . . . Yet, it is clear that credible evidence in this record does not establish actual nexus with the crime, and our jurisprudence requires the nexus be proven. *Wallace (II)*, 773 P.2d at 985–86.  Importantly, were we to hold otherwise, the family dysfunction factor and the impairment factor would become meaningless because virtually every homicide defendant can point to background dysfunction, abuse, or neglect as a basis for mitigation and leniency.

14 P.3d 997, 1021–22  (Ariz. 2000) (emphasis added and some citations omitted).

The decisions of the Arizona Supreme Court make clear that family background or a mental condition could be given weight as a nonstatutory mitigating factor, but only if defendant established a causal connection between the background or condition and his criminal behavior.  For a little over fifteen years, the Arizona Supreme Court routinely articulated and insisted on its unconstitutional causal nexus test, as seen in *Wallace* (1989), *Ross* (1994), *Djerf* (1998), and *Hoskins* (2000), as just described, and in many other cases.  *See, e.g.*, *State v. White*, 815 P.2d 869, 881 (Ariz. 1991) ("'A difficult family background, in and of itself, is not a mitigating circumstance.'" (quoting *Wallace*, 773 P.2d at

986)); *State v. Brewer*, 826 P.2d 783, 802 (Ariz. 1992) ("The evidence of defendant's troubled background establishes only that a personality disorder exists. It does not prove that, at the time of the crime, the disorder controlled defendant's conduct or impaired his mental capacity to such a degree that leniency is required."); *State v. Bible*, 858 P.2d 1152, 1209 (Ariz. 1993) (holding that the defendant's family history was not mitigating in part because "Defendant made no showing that any difficult family history had anything to do with the murder" (citing *Wallace*, 773 P.2d at 986)); *State v. Bolton*, 896 P.2d 830, 854 (Ariz. 1995) ("A difficult family background, however, is not always a mitigating circumstance. If it were, many homicide defendants could point to some circumstance in their background that would call for mitigation. A difficult family background is a mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond his control." (citing *Wallace*, 773 P.2d at 986)); *State v. Stokley*, 898 P.2d 454, 473 (Ariz. 1995) ("A difficult family background alone is not a mitigating circumstance." (citing *Wallace*, 773 P.2d at 986)); *State v. Jones*, 917 P.2d 200, 219–20 (Ariz. 1996) (defendant's "chaotic and abusive childhood [was] not a mitigating circumstance" because there was no causal nexus to the crime); *State v. Towery*, 920 P.2d 290, 311 (Ariz. 1996) ("We have held that a difficult family background is not always entitled to great weight as a mitigating circumstance. *State v. Wallace*, [773 P.2d at 985–86] ('A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control.')"); *State v. Rienhardt*, 951 P.2d 454, 467 (Ariz. 1997) ("[T]his court has rejected past drug and alcohol use as a mitigating circumstance calling for leniency

when there is no evidence of a causal connection between the substance abuse and the crime."); *State v. Greene*, 967 P.2d 106, 117 (Ariz. 1998) ("Greene's mother may have introduced him to drugs, but Greene failed to show how this influenced his behavior on the night of the murder.  Thus, we do not find Greene's dysfunctional family history to be a mitigating circumstance." (internal citation omitted)); *State v. Sharp*, 973 P.2d 1171, 1182 (Ariz. 1999) ("[W]e require a causal connection to justify considering evidence of a defendant's background as a mitigating circumstance."); *State v. Kayer*, 984 P.2d 31, 46 (Ariz. 1999) (holding that the defendant's mental impairment "was not established as a nonstatutory mitigating factor" in part because "defendant offered no evidence to show the requisite causal nexus that mental impairment affected his judgment or his actions at the time of the murder"); *State v. Martinez*, 999 P.2d 795, 809 (Ariz. 2000) ("There is simply no nexus between Martinez' family history and his actions on the Beeline Highway.  His family history, though regrettable, is not entitled to weight as a non-statutory mitigating factor."); *State v. Canez*, 42 P.3d 564, 594 (Ariz. 2002) ("[A] causal nexus between the intoxication and the offense is required to establish non-statutory impairment mitigation."); *id.* at 595 ("A defendant's difficult childhood is mitigating only where causally connected to his offense.").

The Arizona Supreme Court articulated the causal nexus test in various ways but always to the same effect: As a matter of law, a difficult family background or mental condition did not qualify as a nonstatutory mitigating factor unless it had a causal effect on the defendant's behavior in committing the crime at issue.  The Arizona Court frequently stated categorically that, absent a causal nexus, would-be nonstatutory mitigation was simply "not a mitigating

circumstance." *Wallace*, 773 P.2d at 986. Sometimes, the court stated that evidence offered as nonstatutory mitigation that did not have a causal connection to the crime should be given no "weight." For example, as it wrote in *Djerf*:

> Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior. The trial court considered the evidence but found it irrelevant and declined to give it weight because proof was lacking that his family background had any effect on the crimes.

*Djerf*, 959 P.2d at 1289 (citation omitted). Similarly, the court wrote in *Martinez*, "There is simply no nexus between Martinez' family history and his actions on the Beeline Highway. His family history, though regrettable, is not entitled to weight as a non-statutory mitigating factor." *Martinez*, 999 P.2d at 809.

Sometimes, the Arizona Supreme Court stated that evidence of a difficult family background or mental illness was "not necessarily" or not "usually" mitigating, and then (often in the same paragraph) held as a matter of law that the evidence in the specific case before the Court was not mitigating because it had no causal connection to the crime. For example, the Court wrote in *Jones*,

> *A difficult family background is not necessarily a mitigating circumstance* unless defendant can show that something in his background had an effect on his behavior that

> was beyond his control. . . . *[H]owever, the trial court did not find any connection between defendant's family background and his conduct on the night of the murders, and our review of the record does not reveal any such connection.    Thus, we find that defendant's chaotic and abusive childhood is not a mitigating circumstance.*

*Jones*, 917 P.2d at 219–20 (emphasis added).

Similarly, the Court wrote in *Hoskins*, quoting an earlier case, "'An abusive family background is *usually given significant weight as a mitigating factor only when* the abuse affected the defendant's behavior at the time of the crime.'" *Hoskins*, 14 P.3d at 1021 (emphasis added) (quoting *State v. Mann*, 934 P.2d 784, 795 (Ariz. 1997)). The court in *Hoskins* then went to state and apply the unconstitutional causal nexus test as a matter of law to the evidence in the case before it, writing,

> [I]t is essential not only that a personality disorder be shown to exist but that it be causally linked to the crime at the time the crime is committed. . . .
>
> . . . Because defendant has not connected his anti-social or personality disorder to the car-jacking and murder, it cannot be considered a relevant mitigating circumstance. . . .
>
>         . . . .

> . . . *If the defendant fails to prove causation, the circumstance will not be considered mitigating.* However, if the defendant proves the causal link, the court then will determine what, if any, weight to accord the circumstance in mitigation.

*Id.* at 1021–22 (emphasis added).

In the mid-2000s, after the United States Supreme Court emphatically reiterated the *Eddings* rule in *Tennard v. Dretke*, 542 U.S. 274 (2004), the Arizona Supreme Court finally abandoned its unconstitutional causal nexus test for nonstatutory mitigation. In its first post-*Tennard* case addressing *Eddings*, the Arizona Supreme Court properly stated the rule in a jury sentencing case:

> While *Eddings* and various other Supreme Court decisions dictate a liberal rule of *admissibility* for mitigating evidence, they still leave it to the sentencer to "determine the weight to be given to relevant mitigating evidence." *Eddings*, 455 U.S. at 114–15, 102 S.Ct. 869. Once the jury has heard all the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight.

*State v. Anderson*, 111 P.3d 369, 392 (Ariz. 2005). A year later, in a judge-sentencing case, the Arizona Supreme Court, relying on *Anderson*, again properly stated the rule:

> We do not require that a nexus between the
> mitigating factors and the crime be
> established before we consider the mitigation
> evidence. *See Tennard v. Dretke*, 542 U.S.
> 274, 287, 124 S.Ct. 2562, 159 L.Ed.2d 384
> (2004). But the failure to establish such a
> causal connection may be considered in
> assessing the quality and strength of the
> mitigation evidence.

*State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006).

### B. Our "Clear Indication" Test

Not counting the case now before us, we have decided nine Arizona capital cases in which petitioners have alleged that the Arizona Supreme Court, as a matter of law, treated would-be mitigation evidence as legally irrelevant in violation of *Eddings*. In two of these cases, we held that the Arizona Supreme Court committed *Eddings* error. *See Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010); *Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2008) (per curiam). In the other seven, we held that the Arizona Court had not committed *Eddings* error. In six of these, we applied a test first articulated in *Schad v. Ryan*, 581 F.3d 1019, 1037 (9th Cir. 2009) (per curiam) (unamended opinion), under which we could not find *Eddings* error unless there was a "clear indication in the record" that the Arizona Court had refused, as a matter of law, to treat nonstatutory mitigation evidence as relevant unless it had some effect on the petitioner's criminal behavior. *See Hedlund v. Ryan*, 750 F.3d 793, 818 (9th Cir. 2014); *Murray v. Schriro*, 746 F.3d 418, 455 (9th Cir. 2014); *Clabourne v. Ryan*, 745 F.3d 362, 373 (9th Cir. 2014) (petition for panel rehearing and for rehearing en banc

pending); *Poyson v. Ryan*, 743 F.3d 1185, 1188 (9th Cir. 2013); *Lopez v. Ryan*, 630 F.3d 1198, 1203 (9th Cir. 2011); *Schad v. Ryan*, 671 F.3d 708, 724 (9th Cir. 2011) (per curiam) (amended opinion). In the seventh, we did not apply the "clear indication" test. *See Towery v. Ryan*, 673 F.3d 933 (9th Cir. 2012). In none of the cases in which we held that there had been no *Eddings* error did we hold that the Arizona Supreme Court had renounced its causal nexus test. Rather, we held only that petitioners had not shown that the Court had applied the test in such a way as to treat nonstatutory mitigation evidence irrelevant as a matter of law.

In our amended opinion in *Schad*, we stated the "clear indication" test as follows:

> *Absent a clear indication in the record* that the state court applied the wrong standard, we cannot assume the courts violated *Edding*'s constitutional mandates. *See Bell v. Cone*, [543 U.S. 447, 455] (2005) ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.").

*Schad*, 671 F.3d at 724 (emphasis added). The language from *Bell*, quoted in *Schad* in support of its "clear indication" rule, states only that we may not presume that a state court failed to follow federal constitutional law based on "nothing more than a lack of citation." But in *Schad* we broadened the language from *Bell* and transformed it into a prohibition against an "assumption" of unconstitutionality in the absence of a "clear indication" to the contrary.

When used in *Bell*, the quoted language stated a rule that is applicable in a narrow circumstance: a federal habeas court should not presume, merely because a state court has failed to cite a federal case, that the state court was unaware of or failed to follow the rule established in that case. The *Bell* rule is eminently sensible. A presumption of ignorance or disregard of federal law based merely on a failure of citation by a busy state court is both unrealistic and disrespectful. But the *Bell* rule, as stated by the Supreme Court, has a relatively narrow application. It is not a broad rule requiring federal habeas courts to assume in all circumstances, including *Eddings* cases, that absent a "clear indication" to the contrary, a state understood and properly applied federal law.

Congress knows how to limit federal collateral review by requiring deference to state court decisions, and it has done so in AEDPA. Under 28 U.S.C. § 2254(d), federal courts shall not issue writs of habeas corpus on any claim adjudicated in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Section 2254(d) is already a form of a clear statement or a clear indication rule, which all federal courts are required to follow. The "clear indication" rule stated by our circuit for the first time in *Schad*, and applicable in our circuit only in *Eddings* cases, is an inappropriate and unnecessary gloss on the deference already required under § 2254(d). We therefore overrule *Schad*, and the cases that have followed it, with respect to the "clear indication" test.

C.  Application of the Causal Nexus Test in This Case

For the reasons that follow, we conclude that the Arizona Supreme Court applied its unconstitutional causal nexus test to McKinney's PTSD, refusing, as a matter of law, to treat it as a relevant nonstatutory mitigating factor.  This was contrary to clearly established federal law as established in *Eddings*.

We review the decision of the highest state court to have provided a reasoned decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991).  The Arizona Supreme Court reviews capital sentences *de novo*, making its own determination of what constitute legally relevant aggravating and mitigating factors, and then weighing those factors independently.  Ariz. Rev. Stat. Ann. § 13-755.  The Arizona Supreme Court "conducts a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified."  *McKinney*, 917 P.2d at 1225. The Court "considers the quality and strength, not simply the number, of aggravating or mitigating factors."  *Id.*

In reviewing the *de novo* sentencing decision of the Arizona Supreme Court, we look only to the decision of that Court.  We look to the decision of the sentencing judge only to the degree it was adopted or substantially incorporated by the Arizona Supreme Court. *See Barker v. Fleming*, 423 F.3d 1085, 1903 (9th Cir. 2005) (holding that when "the last reasoned decision adopted or substantially incorporated the reasoning from a previous decision," it is "reasonable for the reviewing court to look at both decisions to fully ascertain the reasoning of the last decision").  The sentencing judge accepted the factual accuracy of Dr. McMahon's diagnosis of PTSD, saying that he was "certainly not trying to dispute him

as an expert on what all that meant." The judge then went on to say that "Dr. McMahon did not at any time suggest in his testimony nor did I find any credible evidence to suggest that, even if the diagnosis of Post-traumatic Stress Syndrome were accurate in Mr. McKinney's case, *that it in any way significantly impaired Mr. McKinney's conduct*." (Emphasis added.) He further stated:

> [I]t appeared to me that based upon all these circumstances that there simply was no substantial reason to believe that even if the trauma that Mr. McKinney had suffered in childhood had contributed to an appropriate diagnosis of Post-traumatic Stress Syndrome *that it in any way affected his conduct in this case.*

(Emphasis added.) The italicized language echoes the language of Arizona's statutory mitigator under Ariz. Rev. Stat. § 13-703(G)(1). It also echoes the language used by the Arizona Supreme Court to articulate the unconstitutional causal nexus test applied to nonstatutory mitigation. *See*, *e.g.*, *Wallace*, 773 P.2d at 986 ("A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that back ground *had an effect or impact on his behavior that was beyond his control*.") (emphasis added).

The Arizona Supreme Court affirmed McKinney's death sentence in 1996, roughly in the middle of the fifteen-year-plus period during which it insisted on its unconstitutional nexus test for nonstatutory mitigation. The Court reviewed in its opinion the death sentences of both Hedlund and McKinney. The Court first affirmed Hedlund's death sentence, writing, "A difficult family background, including

childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, to comprehend, or to control his actions. *See State v. Ross*, . . . 886 P.2d 1354, 1363 (1994)." *McKinney*, 917 P.2d at 1226. As we pointed out above, the pin citation to *Ross* is a citation to the precise page on which the Arizona Supreme Court had two years earlier articulated its unconstitutional "causal nexus" test for non-statutory mitigation.

When the Arizona Supreme Court reviewed McKinney's death sentence, it again relied on *Ross.* The Court wrote that the sentencing judge had given "full consideration" to McKinney's childhood and resulting PTSD, using the word "consideration" in the sense of considering whether the evidence was, or was not mitigating. *See Djerf*, 959 P.2d at 1289 ("This court has held that *Lockett* and *Eddings* require only that the sentencer *consider* evidence proffered for mitigation. The sentencer, however, is entitled to give it the weight it deserves. Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior.") (emphasis added).

Reviewing McKinney's sentence *de novo*, the Arizona Supreme Court addressed "the effects of [McKinney's] childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD)." *McKinney*, 917 P.2d at 1234. The Court accepted the conclusion of the sentencing judge that, as a factual matter, McKinney had not shown that his PTSD had causally contributed to the murders of Mertens and McClain. Indeed, the Arizona Supreme Court went further, pointing out that McKinney's PTSD, if anything, would have had the opposite effect, influencing him *not* to have committed the

murders. Because the Court concluded that McKinney's
PTSD was not causally connected to his crimes, it refused, as
a matter of law, to treat his PTSD as a mitigating factor.
After describing McKinney's PTSD evidence and assessing
*de novo* the effect of his PTSD on his behavior, the Court
recited its causal nexus test. The Court concluded with a pin
citation to the precise page in *Ross* on which, two years
earlier, it had articulated the causal nexus test for
nonstatutory mitigation.

We quote in full the relevant paragraph:

> Here again, the record shows that the
> judge gave full *consideration* to McKinney's
> childhood and the expert testimony regarding
> the effects of that childhood, specifically the
> diagnosis of post-traumatic stress disorder
> (PTSD). Assuming the diagnoses were
> correct, the judge found that none of the
> experts testified to, and none of the evidence
> showed, that such conditions in any way
> impaired McKinney's ability to conform his
> conduct to the law. The judge noted that
> McKinney was competent enough to have
> engaged in extensive and detailed preplanning
> of the crimes. McKinney's expert testified
> that persons with PTSD tended to avoid
> engaging in stressful situations, such as these
> burglaries and murders, which are likely to
> trigger symptoms of the syndrome. The judge
> observed that McKinney's conduct in
> engaging in the crimes was counter to the
> behavior McKinney's expert described as
> expected for people with PTSD. As we noted

> in discussing Hedlund's claim on this same issue, *a difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant's ability to perceive, comprehend, or control his actions. See State v. Ross*, . . . 886 P.2d 1354, 1363 (1994)[.]

*Id.* at 1234 (emphasis added).

Based on (1) the factual conclusion by the sentencing judge, which the Arizona Supreme Court accepted, that McKinney's PTSD did not "in any way affect[] his conduct in this case," (2) the Arizona Supreme Court's additional factual conclusion that, if anything, McKinney's PTSD would have influenced him *not* to commit the crimes, and (3) the Arizona Supreme Court's recital of the causal nexus test for nonstatutory mitigation and its pin citation to the precise page in *Ross* where it had previously articulated that test, we conclude that the Arizona Supreme Court held, as a matter of law, that McKinney's PTSD was not a nonstatutory mitigating factor, and that it therefore gave it no weight. This holding was contrary to *Eddings*. We therefore hold that the decision of the Arizona Supreme Court applied a rule that was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### D.  Structural or Harmless Error

We have not heretofore decided whether an *Eddings* error is structural error. We do so now and conclude that it is not.

The Supreme Court has consistently characterized structural errors as "structural defects in the constitution of the trial mechanism." *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). Because such errors go to the framework within which judicial proceedings are conducted, they "infect the entire trial process" and accordingly require "automatic reversal of the conviction." *Id.* at 629–30; *see also Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (noting that structural errors "affect[] the framework within which the trial proceeds"). Some structural errors produce a fundamentally flawed record, so "any inquiry into [their] effect[s] on the outcome of the case would be purely speculative." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988); *see also Rose v. Clark*, 478 U.S. 570, 579 & n.7 (1986) (holding that harmless-error analysis was appropriate because "[u]nlike errors such as judicial bias or denial of counsel, the error in this case did not affect the composition of the record. Evaluation of whether the error prejudiced respondent thus does not require any difficult inquiries concerning matters that might have been, but were not, placed in evidence").

By contrast, harmless-error analysis applies to trial errors, "which may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless." *Fulminante*, 499 U.S. at 307–08. Because "the error occurs at trial and its scope is readily identifiable[,] . . . the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury." *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978). For example, in *Satterwhite*, the Court applied harmless-error analysis to a Sixth Amendment error resulting in the improper admission of testimony from a psychiatrist who had examined Satterwhite without notifying his attorney.

486 U.S. at 258. The Court noted that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer." *Id.* However, it held that the error at issue was subject to harmless-error analysis because the admission of testimony was an error of limited scope that was ready identifiable and whose impact could be assessed by a reviewing court. *Id.* at 257–58.

## E. Harmless Error

The harmless-error standard on habeas review provides that "relief must be granted" if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Id.* at 637 (internal quotation marks omitted). But, as with the stricter *Chapman* standard, the "risk of doubt" is placed "on the State." *O'Neal v. McAninich*, 513 U.S. 432, 439 (1995). On federal habeas, in the absence of structural error that requires automatic reversal, "relief is appropriate only if the prosecutor cannot demonstrate harmless error." *Ayala v. Davis*, 135 S. Ct. 2187, 2197 (2015).

The Court explained in *Kotteakos*,

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the

> error, it is impossible to conclude that
> substantial rights were not affected. The
> inquiry cannot be merely whether there was
> enough to support the result, apart from the
> phase affected by the error. It is rather, even
> so, whether the error itself had substantial
> influence. If so, or if one is left in grave
> doubt, the conviction cannot stand.

328 U.S. at 765. Accordingly, "[w]hen a federal judge in a
habeas proceeding is in grave doubt about whether a trial
error of federal law had 'substantial and injurious effect or
influence in determining the jury's verdict,' that error is not
harmless. And, the petitioner must win." *O'Neal*, 513 U.S.
at 436.

We hold that the *Eddings* error committed by the Arizona
Supreme Court in this case had a "substantial and injurious
effect" on McKinney's sentence within the meaning of
*Brecht*. McKinney presented evidence of severe, prolonged
childhood abuse that, in the words of the sentencing judge,
was "beyond the comprehension and understanding of most
people." Dr. McMahon diagnosed McKinney as suffering
from PTSD as a result of his horrific childhood. McKinney's
PTSD was important mitigating evidence, central to his plea
for leniency, but the Arizona Supreme Court, as a matter of
law, gave it no weight. *See Coleman v. Calderon*, 210 F.3d
1047, 1051 (9th Cir. 2000) (constitutionally infirm jury
instruction was not harmless because "it undermined the very
core of Coleman's plea for life"). We hold here, as we did in
*Styers*, that PTSD is mitigating evidence under *Eddings*.
*Styers*, 547 F.3d at 1035–36 (granting the writ based on
*Eddings* error by the Arizona Supreme Court in treating
PTSD mitigation evidence irrelevant as a matter of law). We

hold, further, as we also did in *Styers*, that the Arizona Supreme Court's refusal, as matter of law, to give weight to petitioner's PTSD, requires resentencing. *Id.*

"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *see also Lockett*, 438 U.S. at 605 ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."). When a defendant's life is at stake, the Supreme Court has consistently emphasized the importance of a properly informed, individualized sentencing determination. *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264 (2007) (noting that *Lockett* and its progeny "have made clear that when the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence . . . the sentencing process is fatally flawed"); *Satterwhite*, 486 U.S. at 258 ("It is important to avoid error in capital sentencing proceedings."); *McCleskey*, 481 U.S. at 304; *Lockett*, 438 U.S. at 604 ("We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.").

We recognize that there were important aggravating factors in this case. Although the jury had not found that McKinney had himself killed either Ms. Mertens or Mr. McClain, the sentencing judge concluded, based on substantial evidence, that McKinney had killed Ms. Mertens,

though not Mr. McClain. Further, McKinney had been involved, as either the actual killer or as an accessory, in two murders; the murders had been done for pecuniary gain; and there had been cruelty to Mertens in the struggle preceding her death. We do not give "short shrift" to, or minimize the importance of, these aggravating factors. *Bobby v. Van Hook*, 558 U.S. 4, 13 (2009) (per curiam). But we conclude that McKinney's evidence of PTSD resulting from sustained, severe childhood abuse would have had a substantial impact on a capital sentencer who was permitted to evaluate and give appropriate weight to it as a nonstatutory mitigating factor. We conclude in this case that the Arizona Supreme Court's application of its causal nexus test to exclude, as a matter or law, evidence of McKinney's PTSD was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," and that its application of the test had a "substantial and injurious effect or influence" on its decision to sentence McKinney to death. *Brecht*, 507 U.S. at 623 (internal quotation marks omitted).

## VIII. Response to Dissent

The foregoing opinion speaks for itself, but we add a few words to respond directly to two contentions in the dissent with which we particularly disagree.

### A. Consistent Articulation and Application of the Causal Nexus Test

First, the dissent contends that during the relevant period the Arizona Supreme Court was inconsistent in its articulation and application of its unconstitutional causal nexus test for nonstatutory mitigation. We disagree. As we discuss in the body of our opinion, the Arizona Supreme Court, during a

period of just over fifteen years, consistently insisted upon and applied its causal nexus test to nonstatutory mitigation. In no case during this period did the Court give any indication that the causal nexus test was not the law in Arizona, or any indication that it had the slightest doubt about the constitutionality of the test.

The dissent particularly relies on four Arizona Supreme Court cases. Dissent at 89–96. Those cases are *State v. Towery*, 920 P.2d 290 (Ariz. 1996), *State v. Thornton*, 929 P.2d 676 (Ariz. 1996), *State v. Gonzales*, 892 P.2d 838 (Ariz. 1995), and *State v. Trostle*, 951 P.2d 869 (Ariz. 1997). None of the four cases even remotely supports the dissent's contention.

Of the four cases, the dissent emphasizes *Towery*. Dissent at 89–90. In *Towery*, however, the Arizona Supreme Court clearly articulated and applied its causal nexus test. The defendant in *Towery* had introduced, as a would-be mitigating factor, evidence of his difficult family background. The sentencing judge "rejected the evidence as a mitigating factor because [Towery] failed to establish a nexus between his family background and his crime." *Towery*, 920 P.2d at 310. The Arizona Supreme Court, on *de novo* review, affirmed the death sentence. It wrote:

> We have held that a difficult family background is not always entitled to great weight as a mitigating circumstance. *State v. Wallace*, . . . 773 P.2d 983, 985–86 (1989) ("A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was

> beyond the defendant's control.")[.] We have since reaffirmed that family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct. *White*, . . . 815 P.2d at 881–82.
>
> Defendant has failed to connect his family background to his criminal conduct.

*Id.* at 311 (citations shortened). The Court in *Towery* could hardly have been clearer. It both articulated and applied its unconstitutional causal nexus test to treat as irrelevant, as a matter of law, nonstatutory mitigation evidence of the defendant's family background because he had "failed to connect his family background to his criminal conduct." Our three-judge panel decision, reviewing Towery's conviction and sentence on federal habeas, held to the contrary, but it was mistaken in so holding. *See Towery v. Ryan*, 673 F.3d 933 (9th Cir. 2012).

The other three cases are of no greater help to the dissent. In *Thornton*, the sentencing judge had given mitigating weight to defendant's "traumatic childhood, dysfunctional family, and antisocial personality disorder," as it was permitted to do under Arizona law provided there was a causal nexus to the crime. The Arizona Supreme Court affirmed the judge on this point. It did not recite whether the judge had found a causal nexus; it simply affirmed without comment. The defendant contended that the sentencing judge should also have given weight to four other nonstatutory mitigating factors — mental illness, remorse, cooperation, and character. The Arizona Supreme Court rejected the contention that any of these factors were mitigating. It

rejected three of them on the ground that they did not exist as a factual matter. It rejected the fourth with a citation to the precise page in *Ross* in which it had articulated its unconstitutional causal nexus test. In *Gonzales*, defendant contended his good character should have been given mitigating weight. The Arizona Supreme Court rejected the contention, holding as a factual matter that Gonzales did not have good character. In *Trostle*, the Arizona Supreme Court gave mitigating weight to the defendant's mental impairment because the causal nexus test was satisfied. The Court wrote,

> [W]eight to be given to mental impairment should be proportional to a defendant's ability to conform or appreciate the wrongfulness of his conduct.
>
> The defendant here established . . . that he was affected in no small measure by an impaired ability to conform his conduct to the law's requirements. . . . The trial court, therefore, should have given serious consideration to this evidence, either as statutory or nonstatutory mitigation.

951 P.2d at 886.

The dissent also relies on two cases cited in *Lopez v. Ryan*, 630 F.3d 1198, 1204 n.4 (9th Cir. 2011) — *State v. Mann*, 934 P.2d 784 (Ariz. 1997); and *State v. Medrano*, 914 P.2d 225 (Ariz. 1996). Neither case supports the dissent's contention.

In *State v. Mann*, the defendant had advanced four proposed nonstatutory mitigators: (1) the possibility of

consecutive life sentences rather than the death penalty; (2) defendant's relationship to his children; (3) a change in defendant's "lifestyle" after he committed the murders; and (4) defendant's difficult family background. 934 P.2d at 795. The Arizona Supreme Court held as a matter of law that the possibility of consecutive life sentences was "a sentencing option" rather than a mitigating factor. *Id.* With respect to defendant's relationship with his children and his change in lifestyle, the Court held that the defendant had not "established mitigation of sufficient weight to call for leniency." *Id.* Finally, the Court held that defendant's difficult family background was irrelevant as a matter of law. It recited its causal nexus test, citing the precise page in its *Wallace* opinion on which it had articulated and applied the test. The Court then wrote, "Defendant did not show any connection." *Id.*

In *State v. Medrano*, the defendant contended that his cocaine intoxication was both a statutory and nonstatutory mitigating factor. The sentencing judge had found as a factual matter that defendant's cocaine intoxication had not affected his behavior in committing the crime. The Arizona Supreme Court applied the causal nexus test, writing that the sentencing judge had found that the defendant had "not proven by a preponderance of the evidence, either as a statutory or nonstatutory mitigating factor, that cocaine intoxication had contributed to his conduct on the night of the murder." 914 P.2d at 227. The Arizona Supreme Court accepted the factual finding of the sentencing judge that there had been no causal nexus. The Court wrote that defendant's evidence was "unpersuasive" and that his cocaine use therefore "fail[ed] as a non-statutory mitigating circumstance." *Id.* at 229.

As we noted at the beginning of our opinion, the Arizona Supreme Court has a strong view of stare decisis. The Court wrote in *White v. Bateman*, 358 P.2d 712, 714 (Ariz. 1961), for example, that its prior case law "should be adhered to unless the reasons of the prior decisions have ceased to exist or the prior decision was clearly erroneous or manifestly wrong." *See also Young v. Beck*, 251 P.3d 380, 385 (Ariz. 2011) ("[S]tare decisis commands that 'precedents of the court should not be lightly overruled,' and mere disagreement with those who preceded us is not enough." (quoting *State v. Salazar*, 173 Ariz. 399, 416 . . . (1992))); *State ex re. Woods v. Cohen*, 844 P.2d 1147, 1148 (Ariz. 1993) (referring to "a healthy respect for stare decisis"); *State v. Williker*, 491 P.2d 465, 468 (Ariz. 1971) (referring to "a proper respect for the theory of stare decisis").

Consistent with its view of stare decisis, the Arizona Supreme Court applied its unconstitutional causal nexus test consistently throughout during the relevant period. We would hardly expect the Court have done otherwise, given its view of stare decisis and the causal nexus test. The test was, of course, premised on a mistaken understanding of *Eddings*. The Court corrected its mistake, consistent with its view of stare decisis under *Bateman* ("the prior decision was clearly erroneous or manifestly wrong"), after the United States Supreme Court emphatically reiterated the *Eddings* rule in 2004 in *Tennard v. Dretke*. *See State v. Anderson*, 111 P.3d 369 (Ariz. 2005). But a mistake is only a mistake. All courts, even very good courts, make mistakes. A good court, however, does not apply an established rule erratically, enforcing it arbitrarily in some cases but not in others. We have great respect for the Supreme Court of Arizona, whose institutional integrity is demonstrated, *inter alia*, by the

consistent application of the causal nexus test during the fifteen-year period it was in effect.

## B.  Appellate Review and "Unreasonable Determination of Fact"

Second, the dissent contends that the critical question before us is whether the Arizona Supreme Court properly concluded that the sentencing judge "fully considered McKinney's PTSD."  Dissent at 82.  It further contends that we must review whether the Court properly so concluded under the "unreasonable determination of fact" standard of AEDPA.  28 U.S.C. § 2254(d)(2).  According to the dissent, the Arizona Supreme Court did not unreasonably make the factual determination that the sentencing judge had "fully considered McKinney's PTSD."  Therefore, according to the dissent, we must uphold the sentencing decision of the Arizona Supreme Court.  The dissent misunderstands both the significance of the Arizona Supreme Court's *de novo* review in capital cases, and the "unreasonable determination of fact" standard of review under AEDPA.

Contrary to the view of the dissent, the Arizona Supreme Court in reviewing capital sentences does not base its decision on whether the sentencing judge fully considered aggravating and mitigating factors.  Rather, as we indicated above, the Arizona Supreme Court reviews capital sentences *de novo*, making its own independent determination of what constitute legally relevant aggravating and mitigating factors, and then performing an independent weighing of those factors.  In its own words, the Arizona Supreme Court "conducts a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified, . . . consider[ing] the quality

and strength, not simply the number, of aggravating or mitigating factors." *McKinney*, 917 P.2d at 1225.

Further, and also contrary to the view of the dissent, the question whether the sentencing judge "fully considered McKinney's PTSD" is not a question of "fact" under § 2254(d)(2). A "fact" under § 2254(d)(2) is an evidentiary fact, such as whether a defendant had PTSD or whether a defendant's PTSD had a causal nexus to the crime. *See*, *e.g.*, *Wood v. Allen*, 558 U.S. 290, 850 (2010) (analyzing evidentiary facts under § 2254(d)(2)). Whether a sentencing judge fully considered an evidentiary fact is not a "fact" within the meaning of § 2254(d)(2).

## Conclusion

We review the decision of the Arizona Supreme Court, as the last reasoned state court decision. The Arizona Supreme Court reviewed McKinney's death sentence *de novo*. That Court accepted the factual conclusion of the trial judge that, as an evidentiary matter, there was no causal nexus between McKinney's PTSD and his crimes. After accepting the conclusion of the trial judge on this factual point, the Court went further, noting that, far from contributing to his crimes, McKinney's PTSD would have influenced him *not* to commit them. The Arizona Supreme Court then recited its unconstitutional causal nexus test for nonstatutory mitigation, followed by a pin citation to the page of *Ross* on which it had articulated that test two years earlier, making clear that, as matter of Arizona law, McKinney's PTSD was not relevant as a nonstatutory mitigating factor.

We **reverse** the district court's judgment denying the writ of habeas corpus. We **remand** with instructions to grant the

writ with respect to McKinney's sentence unless the state, within a reasonable period, either corrects the constitutional error in his death sentence or vacates the sentence and imposes a lesser sentence consistent with law.

---

BEA, Circuit Judge, dissenting, with whom KOZINSKI, GOULD, TALLMAN, and CALLAHAN, Circuit Judges, join:

A state cannot impose the death penalty unless the sentencer has considered all evidence submitted as to the defendant's condition, character, and background. *Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982) (explaining that a sentencer may not "refuse to consider, as a matter of law, any relevant mitigating evidence"). As a result, defendants so sentenced usually and legitimately proffer mitigation evidence provoking sympathy in the hope it will persuade the sentencer to grant leniency and impose a life sentence instead of the death penalty. Here, James McKinney submitted evidence of his squalid, horrid childhood and expert testimony that, as a result of that childhood, he developed Post-Traumatic Stress Disorder ("PTSD"). He urged his PTSD called for mercy for two reasons. First, he argued his PTSD affected his mental capacity "to appreciate the wrongfulness of his conduct" at the time of the murders. This is a statutory mitigation factor under Arizona law.[1] Second, he argued his childhood and childhood-caused PTSD justified leniency, separate from any effect it may have had on his mental state at the time of the murders. That second argument

---

[1] Ariz. Rev. Stat. § 13-751(G)(1).

fits under Arizona's nonstatutory catchall that requires sentencers to consider all proffered mitigation evidence.[2] McKinney admits the sentencing judge, Judge Sheldon, considered his first argument. But McKinney contends Judge Sheldon did not consider the mitigating value of his PTSD for leniency purposes regardless its effect on him at the time of the murders.

McKinney pressed this same claim before the Arizona Supreme Court on direct appeal from the sentence Judge Sheldon imposed. That court correctly stated what *Eddings* requires: "[T]he trial judge must consider any aspect of [a defendant's] character or record and any circumstance of the offense relevant to determining whether a sentence less severe than the death penalty is appropriate."[3] It then rejected McKinney's argument that Judge Sheldon had failed to consider his PTSD separate from its effect on McKinney's mental capacity during the murders: "[T]he record shows that the judge gave *full consideration* to McKinney's childhood and the expert testimony regarding the effects of that childhood, *specifically the diagnosis of post-traumatic stress disorder*."[4] That conclusion makes sense given Judge Sheldon expressly stated at McKinney's sentencing:

---

[2] Ariz. Rev. Stat. § 13-751(G) ("The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense.").

[3] *State v. McKinney*, 917 P.2d 1214, 1226 (Ariz. 1996).

[4] *Id.* at 1234 (emphasis added).

> I have considered [McKinney's arguments] at length, and after considering *all of the mitigating circumstances, the mitigating evidence that was presented by the defense* in this case as against the aggravating circumstances, and *other matters which clearly are not set forth in the statute which should be considered by a court*, I have determined . . . that the mitigating circumstances simply are not sufficiently substantial to call for leniency under all of the facts of this case.

(Emphasis added.)

Our review of McKinney's claim must proceed differently than it did in the Arizona courts on direct appeal. The Supreme Court has told us we must presume "state courts know and follow the law."[5] And, in the *Eddings* context, "[w]e must assume that the trial judge considered all [the] evidence before passing sentence."[6] This appeal could be resolved against McKinney, without the benefit of those presumptions, simply based on the above quotations from the record. This appeal presents even fewer problems to decide under the standard provided by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prescribes "'a difficult to meet' and 'highly deferential standard for evaluating state-court rulings, [and] which demands state-court decisions be given the benefit of the

---

[5] *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

[6] *Parker v. Dugger*, 498 U.S. 308, 314 (1991).

doubt.'"[7] Yet the majority still somehow concludes that, under the standard of review prescribed by AEDPA, there was *Eddings* error in this case.

The majority starts by incorrectly summarizing the Arizona Supreme Court's *Eddings* jurisprudence between 1989 and 2005 as constituting continuous and recurrent *Eddings* error.[8] Not so at all, as our own decisions have repeatedly recognized.[9] Based on its incorrect summary of the Arizona decisions[10] and a paean to stare decisis, the majority then rejects our precedent[11] and concludes that we should never afford the Arizona Supreme Court the presumption that "state courts know and follow the law" with respect to any of

---

[7] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (citation omitted).

[8] Slip op. at 5–7, 26–38.

[9] *See Lopez v. Ryan*, 630 F.3d 1198, 1203–04 (9th Cir. 2011) ("Some cases decided prior to *Tennard* applied a causal nexus requirement in an impermissible manner. Other cases, however, properly looked to causal nexus only as a factor in determining the weight or significance of mitigating evidence."); *Poyson v. Ryan*, 743 F.3d 1185, 1198 (9th Cir. 2013); *Towery v. Ryan*, 673 F.3d 933, 946 (9th Cir. 2012) (per curiam).

[10] For a more accurate relation of the relevant Arizona Supreme Court cases, *see infra* Section III.B.1.

[11] *See Lopez*, 630 F.3d at 1203–04 ("In light of this backdrop, which highlights a range of treatment of the nexus issue, there is no reason to infer unconstitutional reasoning from judicial silence. Rather, we must look to what the record actually says."); *Clabourne v. Ryan*, 745 F.3d 362, 372–73 (9th Cir. 2014), *petition for rehearing and rehearing en banc pending*, No. 09-99022 (9th Cir. Mar. 18, 2014); *Poyson*, 743 F.3d at 1198 n.7; *Schad v. Ryan*, 671 F.3d 708, 723–24 (9th Cir. 2011); *Greenway v. Schriro*, 653 F.3d 790, 807–08 (9th Cir. 2011).

that court's *Eddings* cases.[12] Rather, the majority creates a
new and contrary presumption—that the Arizona courts did
*not* know or follow *Eddings* between 1989 and 2005—and
finds this presumption is not rebutted even where the Arizona
courts have clearly complied with *Eddings*'s mandate.[13] Of
course, this process is quite contrary to the deferential
standard of review the Supreme Court has told us to use.

But the majority does not stop there. When the majority
turns to the record in this case, it misreads it. The majority
first suggests that when Judge Sheldon stated there was no
evidence that McKinney's PTSD "in any way affected his
conduct in this case," he applied an unconstitutional nexus
test to exclude the PTSD from consideration altogether.[14] Not
so. At that portion of the hearing, Judge Sheldon was dealing
with, and rejecting, McKinney's *own argument* that his PTSD
impaired his ability "to appreciate the wrongfulness of his
conduct" at the time of the murders. Next, the majority states
the Arizona Supreme Court "recited its unconstitutional
causal nexus test" when it decided McKinney's appeal.[15] The
court did no such thing; if it did state an unconstitutional
nexus test, this case would be simple. Finally, the majority
ignores the Arizona Supreme Court's careful articulation of
*Eddings*'s requirements and focuses instead on a single case

---

[12] Slip op. at 7.

[13] *See id.*

[14] *Id.* at 19–21, 42.

[15] *Id.* at 21, 44–45, 57.

citation in the Arizona opinion.[16] None of this is permissible under AEDPA.

In short, the majority ignores Supreme Court precedent,[17] implicitly overrules our own precedent,[18] replaces AEDPA's deferential standard of review of state-court decisions with an impermissible de novo standard, and misstates the record when applying that standard. Also quite troubling, the majority wrongly smears the Arizona Supreme Court and calls into question every single death sentence imposed in Arizona between 1989 and 2005 and our cases which have denied habeas relief as to those sentences. Finally, the majority brushes by the facts of McKinney's gruesome crimes to find that the error the majority has manufactured was indeed prejudicial to the outcome of the sentencing, rather than harmless, in contravention of the prejudice standard stated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

I respectfully dissent.

## I.

This case should come down to a review of only a few pages of the transcript from McKinney's sentencing, and a few pages from the Arizona Supreme Court's decision

---

[16] *Id.*

[17] *Visciotti*, 537 U.S. at 22–24; *Parker*, 498 U.S. at 314–16.

[18] *See Clabourne*, 745 F.3d at 372–73, *petition for rehearing and rehearing en banc pending*, No. 09-99022 (9th Cir. Mar. 18, 2014); *Poyson*, 743 F.3d at 1198 & n.7; *Schad*, 671 F.3d at 723–24; *Greenway*, 653 F.3d at 807–08; *Lopez*, 630 F.3d at 1203–04.

affirming his sentence. *State v. McKinney*, 917 P.2d 1214, 1225–27, 1233–34 (Ariz. 1996). A brief discussion of the sentencing proceeding and Arizona's statute governing the application of the death penalty may help analyze these few pages.

### A. The Statutory Scheme and McKinney's Sentencing Arguments

Arizona law separates mitigating evidence into two categories, statutory and nonstatutory. There are five statutory mitigating factors under Arizona's sentencing statute: mental capacity, duress, minor participation, reasonable foreseeability, and age. Ariz. Rev. Stat. § 13-751(G)(1)–(5).[19] The nonstatutory category is a catchall that requires the sentencer to consider "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death," *id.* § 13-751(G), "including any aspect of the defendant's character or any circumstances of the offense relevant to determining whether a capital sentence is too severe." *State v. White*, 982 P.2d 819, 824 (Ariz. 1999).

McKinney's sentencing memorandum included 11 separate parts; each argued for leniency for different reasons. McKinney's two primary arguments in support of leniency were based on his troubled childhood and his claimed resulting PTSD diagnosis. McKinney relied on his PTSD to make two arguments in support of leniency. First, in Part VIII of his sentencing memorandum, McKinney argued his PTSD

---

[19] Arizona renumbered the statute in 2009, and it is now codified without any changes at Ariz. Rev. Stat. § 13-751. *See, e.g.*, *Robinson v. Schriro*, 595 F.3d 1086, 1111 (9th Cir. 2010). This dissent cites to the new location of the statute.

warranted leniency based on the statutory mitigation factor § 13-751(G)(1) ("Mental Capacity Factor"). The Mental Capacity Factor requires the court to consider whether "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Ariz. Rev. Stat. § 13-751(G)(1). McKinney argued his PTSD diminished his capacity to appreciate the wrongfulness of his conduct during the murders of Christene Mertens and Jim McClain. It must be kept in mind that it was McKinney who claimed a causal nexus between his PTSD and his commission of the murders. So the sentencing judge can hardly be faulted for considering this as "nexus" evidence.

Second, in Parts I and VII of his sentencing memorandum, McKinney argued his PTSD warranted leniency separate from any effect that PTSD may have had on him at the time of the murders. This argument did not assert McKinney's PTSD played a role in the two murders. Thus, it did not fall under the statutory Mental Capacity Factor, or any other specific statutory mitigation factor. *See id.* § 13-751(G) (duress, minor participation, reasonable foreseeability, and age). Instead, it fit under the nonstatutory catchall, quoted above.

### B. The PTSD Testimony

McKinney called Diana McKinney, his sister, Susan Sesate, his aunt, and Dr. Mickey McMahon, a psychologist, to testify. The state called Dr. Steven Gray in rebuttal to Dr. McMahon's testimony. McKinney's sister and aunt testified to the conditions of McKinney's squalid, harsh childhood. Dr.

McMahon opined McKinney's childhood caused McKinney to develop PTSD.

Dr. McMahon testified that McKinney was a "loner" and not the type of criminal who would engage in "thrill-seeking behavior," such as committing a crime for the sake of the excitement the crime provided. Instead, McKinney's PTSD would lead him to avoid confrontations and stressful situations; and McKinney "tries to respond to [stress] by withdrawing." Dr. McMahon agreed that McKinney would leave a stressful situation to avoid a confrontation if he could do so.

Dr. McMahon testified there was a "high likelihood" that McKinney's PTSD was triggered during his confrontation with his first victim, Christene Mertens, and McKinney's mental capacity was diminished as a result. With respect to the McClain robbery and murder, Dr. McMahon admitted, "I don't have enough facts to say that [McKinney] was suffering from diminished capacity." Dr. McMahon testified that the murder of McClain in his sleep "would be the exact opposite of what I would expect from Mr. McKinney." Those acts were consistent with someone who seeks out stressful situations rather than avoids them; it was a contra-indication to the presence of PTSD.

The prosecution's expert, Dr. Gray, did not diagnose McKinney with PTSD. He did not "think there's enough evidence or diagnostic materials or work that's been done to conclusively diagnose him as having [PTSD]." His tentative diagnosis was that McKinney has antisocial personality disorder. He explained that "[m]ost antisocial people have [a] major disturbance in thinking, not to be confused with schizophrenia or psychosis. They tend to, for example blame

others for their situation." Dr. Gray noted antisocial people typically avoid being a victim. Instead, "they want to be an offender, be in control, be in charge, be powerful even though the manner in which they do that is self-defeating, unhealthy and is abusive, harmful to others." Which is why "people with antisocial personality have a long history of conflict with the law."

At the conclusion of the evidence, trial judge Sheldon credited defense expert Dr. McMahon's testimony that McKinney had PTSD over Dr. Gray's contrary opinion. He found that Dr. McMahon's opinion was entitled "to more weight" than Dr. Gray's testimony. He then adjourned for three days to consider the evidence before ruling on McKinney's sentence.

C. Judge Sheldon Considers McKinney's PTSD Evidence

Judge Sheldon imposed his sentence on July 23, 1993. At the outset of that hearing, he found the prosecution proved two aggravating factors for the Mertens murder: In the language of the statute, McKinney (1) "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value"; and (2) "committed the offense in an especially heinous, cruel or depraved manner." *See* Ariz. Rev. Stat. § 13-751(F)(5)–(6). No one disputes the solid footing in the record evidence for finding both of these aggravating factors. McKinney and Hedlund killed to get Mertens's money. And before dispatching Mertens with a bullet to her head, McKinney and Hedlund savagely injured her. Judge Sheldon also found the government proved two aggravating factors for the murder of Jim McClain: (1) the pecuniary-gain aggravating factor; and (2) that McKinney was "convicted of another offense in the

United States for which under Arizona law a sentence of life imprisonment or death was imposable," *i.e.*, the earlier Mertens murder. *See* Ariz. Rev. Stat. § 13-751(F)(1), (5). Again, no one disputes the basis for these findings. McKinney and Hedlund killed McClain to get McClain's money, and McKinney was convicted for the earlier murder of Mertens.

Judge Sheldon then addressed McKinney's mitigation evidence. Judge Sheldon started by crediting Dr. McMahon's testimony twice and accepting Dr. McMahon's PTSD diagnosis as true. Judge Sheldon then addressed McKinney's nexus argument for leniency under the statutory Mental Capacity Factor, *id.* § 13-751(G)(1), which McKinney had cited in his sentencing memorandum. Judge Sheldon stated there was no evidence McKinney's PTSD "in any way significantly impaired Mr. McKinney's conduct." He repeated that conclusion a second time moments later, where he concluded there was no evidence that McKinney's PTSD "in any way affected his conduct in this case."[20] Judge Sheldon reached that conclusion based on McKinney's planning of the burglaries and statements McKinney made to witnesses before the burglaries that he would shoot a resident if he encountered one during the burglaries. Judge Sheldon noted Dr. McMahon testified that a person suffering from PTSD would be withdrawn and would "avoid contacts which would either exacerbate or recreate the trauma that would

---

[20] Early in its opinion, the majority admits that this language is directed to McKinney's argument for leniency under the statutory Mental Capacity Factor. Slip op. at 19. The majority nonetheless suggests these statements *also* show Judge Sheldon applied an unconstitutional nexus test. *Id.* at 20, 42. As I discuss in detail below, at this point in the sentencing colloquy, Judge Sheldon is addressing the statutory mitigating factors and only the statutory mitigating factors. *See infra* Section III.A.2.

bring on this type of stress from childhood." But McKinney sought out stressful situations by planning and executing the burglaries that led to the two murders. Judge Sheldon concluded leniency was not available based upon the statutory Mental Capacity Factor, and repeated a third time his belief that the PTSD did not "significantly impair[]" McKinney's conduct.

This analysis of PTSD under the statutory mitigation factors did not end Judge Sheldon's consideration of McKinney's PTSD for purposes of mitigation. Judge Sheldon next transitioned to address "the other mitigating factors raised by the defense in their memorandum."[21] Those other mitigation factors included, among others, McKinney's Part VII argument for leniency due to his difficult childhood and his psychological history, including his PTSD. After finding McKinney's childhood did not support leniency, Judge Sheldon concluded: "With respect to the *other* matters set out in the [defendant's sentencing] memorandum, I have considered them at length, and after considering all of the mitigating circumstances . . . I have determined that . . . the mitigating circumstances simply are not sufficiently substantial to call for a leniency under all of the facts of this case." (Emphasis added.) The court then sentenced McKinney to death for both first-degree murder convictions.

A week later, Judge Sheldon sentenced McKinney's co-defendant, Michael Hedlund, to death.

---

[21] This was the 27-page, 11-part sentencing memorandum, which Judge Sheldon specifically cited by date during his sentencing colloquy.

### D. McKinney's Direct Appeal to the Arizona Supreme Court

McKinney appealed his sentence. *See McKinney*, 917 P.2d at 1232–34. The Arizona Supreme Court addressed both McKinney's and Hedlund's sentences together in the same opinion, taking Hedlund's first. As is common practice when a court addresses similar claims in the same opinion, the Arizona Supreme Court more fully articulated the legal standard applicable to both when it first addressed Hedlund's arguments. *Id.* at 1225–27. For Hedlund's *Eddings* error argument, the court detailed what *Eddings* requires:

> Hedlund correctly observes that the trial judge must consider any aspect of his character or record and any circumstances of the offense relevant to determining whether a sentence less severe than death is appropriate. In considering such material, however, the judge has broad discretion to evaluate expert mental health evidence and to determine the weight and credibility given to it.

*Id.* at 1226. The court then rejected Hedlund's argument that Judge Sheldon failed to consider his mitigation evidence. *Id.* at 1226–27.

The court reached the same conclusion for McKinney's *Eddings* argument: "Here again, the record shows that the judge gave full consideration to McKinney's childhood and the expert testimony regarding the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder." *Id.* at 1234. The court concluded: "The record clearly shows that the judge considered McKinney's abusive childhood and

its impact on his behavior and ability to conform his conduct and found it insufficiently mitigating to call for leniency." *Id.* The court held Judge Sheldon did not err and affirmed McKinney's sentence. *Id.*

II.

A. What *Eddings v. Oklahoma* Requires and What It Prohibits

*Eddings*'s command is simple. In *Eddings*, the trial judge stated that "in following the law" he could not "consider the fact of this young man's violent background" in determining whether to sentence him to death. *Eddings*, 455 U.S. at 112–13. The Supreme Court held the trial judge's refusal to consider the evidence was unconstitutional under the Eighth Amendment. *Id.* at 113–15. "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 113–14. Yet the Court made clear that the sentencer "may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." *Id.* at 114–15. In later cases, the Supreme Court clarified that the sentencer cannot refuse to consider evidence because that evidence does not bear a causal nexus to the crime. *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). We have recognized that the sentencer may consider a "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence." *Lopez v. Ryan*, 630 F.3d

1198, 1204 (9th Cir. 2011) (citing *Eddings*, 455 U.S. at 114–15).[22]

## B. The "Last Reasoned Decision"

AEDPA governs when we review a state's determination whether a prisoner's rights under the federal Constitution have been violated. *See* 28 U.S.C. § 2254. Under AEDPA, our review is confined to the "last reasoned decision" of the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). The "last reasoned decision" is the most recent "adjudication on the merits" that "finally resolve[s] the rights of the parties on the substance of the claim, rather than on the basis of a procedural or other rule precluding state review of the merits." *Barker*, 423 F.3d at 1092.

I agree with the majority that the Arizona Supreme Court's opinion on direct review is the "last reasoned decision." Slip op. at 41. I do not agree with the majority's

---

[22] A sentencer is free to assign whatever weight, including *no* weight, that mitigating evidence deserves under the facts of the case, as long as the sentencer does not exclude from his consideration relevant mitigating evidence as a matter of law. *See, e.g.*, *Towery*, 673 F.3d at 945 ("One could question the wisdom of the Arizona Supreme Court's decision to accord Towery's evidence little or no weight. . . . However, the court's *reasoned and individualized decision* to give Towery's evidence little or no weight was not contrary to Supreme Court precedent."); *Allen v. Buss*, 558 F.3d 657, 667 (7th Cir. 2009) ("The rule of *Eddings* is that a sentencing court may not exclude relevant mitigating evidence. But of course, a court may choose to give mitigating evidence little or no weight." (citation omitted)); *United States v. Johnson*, 495 F.3d 951, 965 (8th Cir. 2007) ("[J]urors are obliged to consider relevant mitigating evidence, but are permitted to accord that evidence whatever weight they choose, including no weight at all.").

understanding of that opinion. The majority repeatedly refers to the Arizona Supreme Court's review of McKinney's sentence as a "de novo review." *See, e.g.*, *id.* at 4, 7, 9, 20, 41, 43, 56–57. The Arizona Supreme Court does independently review each death sentence. *See* Ariz. Rev. Stat. § 13-755. But the way it does its "independent review" is first to conduct a normal appellate review to determine whether the trial court made any legal errors when it imposed the death sentence. *See id.* § 13-755(a)–(b). We owe this finding double deference under AEDPA. *See, e.g.*, *Lopez v. Schriro*, 491 F.3d 1029, 1037–38 & n.2 (9th Cir. 2007). After the Arizona Supreme Court reviews for legal errors, it then decides whether the death sentence is justified. *See* Ariz. Rev. Stat. § 13-755(a)–(b); *State v. Roseberry*, 353 P.3d 847, 849–50 (Ariz. 2015) ("[T]his Court reviews the entire record and independently considers whether a capital sentence is not only legally correct, but also appropriate."). Based on its own incorrect notion of what "independent review" means in Arizona practice, the majority converts this appellate review of death sentences into a new sentencing determination and treats McKinney's trial-court sentencing hearing as irrelevant, except insofar as the Arizona Supreme Court accepted Judge Sheldon's factual findings as its own. Slip op. at 21, 41–45.

Although at times we construe an appellate court's decision and a trial court's decision together as the "last reasoned decision," we do so only when the appellate court adopts the trial court's decision. *See, e.g.*, *Barker*, 423 F.3d at 1093. That is not what occurred here. The Arizona Supreme Court did not, as the majority posits, accept any of Judge Sheldon's factual findings as its own. *See* slip op. at 21, 41–45; *McKinney*, 917 P.2d at 1233–34. The court merely reviewed McKinney's argument that Judge Sheldon failed to consider McKinney's mitigation evidence and concluded,

"On this record there was no error." *McKinney*, 917 P.2d at 1234. It also "independently reviewed the record," as it was required to do under Arizona law, and affirmed McKinney's death sentence. *Id.*; *see also id.* at 1225 (explaining the Arizona procedure for reviewing death sentences on direct appeal). For that reason, the Arizona Supreme Court's opinion is the "last reasoned decision." *See Towery v. Ryan*, 673 F.3d 933, 944 n.3 (9th Cir. 2012) (per curiam) (refusing the petitioner's suggestion to "review the decisions of the sentencing court and the [Arizona Supreme Court] together").[23]

## C. AEDPA's Deferential Review

The standard by which federal courts must review state-court decisions under AEDPA is well known, if not always well followed. *See* 28 U.S.C. § 2254(d). Under § 2254(d)(1), a federal court can issue a writ of habeas corpus only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). Under § 2254(d)(2), a federal court can issue the writ only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

---

[23] The majority's error in reviewing Judge Sheldon's colloquy as part of the "last reasoned decision" makes no difference. To dispel any doubts, as I explain below, the record shows both the Arizona Supreme Court and Judge Sheldon complied with *Eddings* even under a de novo review—which is the wrong standard under AEDPA. *See infra* Section III.

We apply the "contrary to" prong of § 2254(d)(1) where, as here, the parties dispute whether a state appellate court applied the correct standard. *See Woodford v. Visciotti*, 537 U.S. 19, 22–24 (2002) (applying § 2254(d)(1) where the parties disputed whether the California Supreme Court applied the correct standard under *Strickland*). In this case, I apply § 2254(d)(1) when analyzing whether the Arizona Supreme Court used an unconstitutional nexus test in its review of McKinney's sentence.

The question whether a trial judge has considered all the proffered mitigation evidence is a factual question, not a legal one. *See Lopez*, 491 F.3d at 1037–38 & n.2. And a state appellate court's finding that the trial judge considered all the proffered mitigation evidence is itself a factual finding. *See id.*; *see also Parker v. Dugger*, 498 U.S. 308, 320 (1991). As a result, I apply § 2254(d)(2) to the Arizona Supreme Court's finding that Judge Sheldon considered all of McKinney's mitigation evidence, which can be overturned only if it was "unreasonable." *See Towery*, 673 F.3d at 945 n.4; *Lopez*, 491 F.3d at 1037–38 & n.2. Judge Sheldon's sentencing colloquy is relevant only for making that determination.[24]

---

[24] The majority's faulty understanding of the Arizona Supreme Court's opinion leads it to conclude that I am wrong to apply § 2254(d)(2) in this case. Slip op. at 56–57. We previously used § 2254(d)(2) in habeas review of Arizona death sentences, *see Towery*, 673 F.3d at 945 n.4; *Lopez*, 491 F.3d at 1037–38 & n.2, as did Judge Wardlaw—who joins the majority opinion—in her partial dissent to the original panel opinion in this case, *see McKinney v. Ryan*, 730 F.3d 903, 925–27 (9th Cir. 2013) (Wardlaw, J., dissenting in part). The majority's disagreement on this point creates a circuit split with at least two other circuits. *See Corcoran v. Neal*, 783 F.3d 676, 685–87 (7th Cir. 2015); *Quince v. Crosby*, 360 F.3d 1259, 1267 (11th Cir. 2004).

III.

I begin by evaluating McKinney's appeal under the correct standard.[25] That standard requires that we first determine whether the Arizona Supreme Court's decision was "contrary to . . . clearly established Federal law" under § 2254(d)(1). Applied here, we must determine whether the Arizona Supreme Court treated McKinney's PTSD as irrelevant to consider whether leniency was justified, because McKinney did not show the PTSD affected his conduct at the time of the murders. If the Arizona Supreme Court treated the PTSD as mitigation evidence relevant to whether leniency was justified, we must then determine whether the Arizona Supreme Court's conclusion that Judge Sheldon fully considered McKinney's PTSD was an "unreasonable determination of fact" under § 2254(d)(2).

## A. The Correct Analysis of the Arizona Supreme Court's Decision

1.

This case primarily boils down to what standard the Arizona Supreme Court applied when addressing *McKinney*'s *Eddings* claim. "A decision is contrary to clearly established law if the state court 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'" *Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) (citation omitted); *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc) ("[U]se of the wrong legal rule or framework . . . constitute[s] error under the 'contrary to' prong of § 2254(d)(1)."). The

---

[25] The majority's incorrect standard is dealt with later. *See infra* Section III.B.

state argues the Arizona Supreme Court correctly applied *Eddings*; McKinney argues the Arizona Supreme Court applied a "nexus" standard to exclude his PTSD from consideration contrary to *Eddings*.

The Supreme Court's decision in *Visciotti* governs our analysis under the "contrary to" prong of § 2254(d)(1). *See Visciotti*, 537 U.S. at 22–24. In *Visciotti*, the petitioner argued the California Supreme Court applied the wrong standard for what constitutes prejudicial error under *Strickland*. *Id.* To prove such prejudice under *Strickland*, "the defendant must establish a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 22 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). In its opinion, the California Supreme Court began its *Strickland* analysis by twice stating the correct standard: "reasonable probability." *Id.* at 22–23. The opinion then misstated the "prejudice" standard four times in other portions of the opinion because it used the term "probable" instead of "reasonably probable." *Id.* at 23.[26] Relying on the misstatements, we found the California Supreme Court applied the incorrect standard. *Id.* at 23–24. The decision was therefore "contrary to" *Strickland* under § 2254(d)(1). *Id.*

In a per curiam opinion, and without the benefit of merits briefing or oral argument, the Supreme Court reversed our judgment. *Id.* at 22–24. The Court chided us for mischaracterizing the California Supreme Court's decision,

---

[26] Petitioner Visciotti made the point that the "reasonably probable" standard was an easier standard of proof for him to meet than the plain "probable." *Visciotti v. Woodford*, 288 F.3d 1097, 1108–09 (9th Cir. 2002).

"which expressed and applied the proper standard for evaluating prejudice." *Id.* at 22. Our "readiness to attribute error [was] inconsistent with the presumption that state courts know and follow the law." *Id.* at 24 (citing *Parker*, 498 U.S. at 314–16 (1991)). Our "readiness to attribute error" was "also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Id.* (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

*Visciotti*'s teaching is not complicated. When we review a state-appellate-court decision under the "contrary to" prong of § 2254(d)(1), we must presume the state court knew and followed federal constitutional law. *Id.* And we must give the court the "benefit of the doubt." *Id.* For that reason, we must construe any ambiguity in language in the state court's favor. As applied to *Eddings* cases, when the state court identifies and articulates the correct *Eddings* standard, we must presume it applied that standard. That presumption can be rebutted by any action by the state court that shows the state court excluded the defendant's mitigation evidence as a matter of law. The easiest way to rebut the presumption would be an express statement from the state court that it was excluding evidence from consideration as a matter of law, such as the trial judge's statements in *Eddings* itself. *See Eddings*, 455 U.S. at 112–13. However, that is not the only way to rebut the presumption. If the state court's reasoning shows, without any ambiguity, that it did not consider relevant mitigation evidence at all, that would suffice to rebut the presumption. Any less deferential review rejects the presumption that *Visciotti* requires. This is the analysis that should replace our "clear indication" test for *Eddings* cases. *See, e.g.*, *Schad v. Ryan*, 671 F.3d 708, 724 (9th Cir. 2011) ("Absent a clear indication in the record that the state court

applied the wrong standard, we cannot assume the courts violated *Eddings*'s constitutional mandates.").

Applying *Visciotti* to this case is quick work. At no point did the Arizona Supreme Court state either that Judge Sheldon had excluded McKinney's PTSD evidence as a matter of law, or that it would have been permissible to do so, under Arizona's nonstatutory catchall because the PTSD bore no nexus to the crime. Nor did the Arizona Supreme Court treat that evidence as if it had no weight as a matter of law. That should be the end of the matter and of McKinney's appeal. All the majority and McKinney do is speculate that, regardless what it stated, the Arizona Supreme Court applied a nexus test to conclude the PTSD evidence was irrelevant under the nonstatutory catchall. *Visciotti* prohibits such speculation.

But let us make a closer inquiry anyway to quell any doubts raised by the majority's flank attack on the Arizona Supreme Court's decision. That court first outlined the *Eddings* standard when, in its combined review of Hedlund's and McKinney's sentences, it stated:

> Hedlund correctly observes that the trial judge *must consider any aspect of his character or record and any circumstance of the offense* relevant to determining whether a sentence less severe than the death penalty is appropriate. In considering such material, however, the judge has broad discretion to evaluate expert mental health evidence and to determine *the weight* and credibility given to it.

*McKinney*, 917 P.2d at 1226 (emphasis added). This is what *Eddings* requires and all that it requires. *See Harris v. Alabama*, 513 U.S. 504, 512 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."). The Arizona Supreme Court then confirmed it knew the difference between excluding mitigation evidence altogether as a matter of law (*Eddings* error) and giving mitigation evidence little or no weight as a matter of fact (permissible under *Eddings* and *Harris*). *See McKinney*, 917 P.2d at 1231 (noting that Judge Sheldon "did not improperly exclude mitigating evidence at sentencing and the mitigating evidence is not of great weight").

The Arizona Supreme Court then found Judge Sheldon complied with *Eddings* in McKinney's case:

> Here again, the record shows that *the judge gave full consideration* to McKinney's childhood and the expert testimony regarding the effects of that childhood, *specifically the diagnosis of post-traumatic stress disorder* (PTSD).

*Id.* at 1234 (emphasis added). The court continued:

> [A] difficult family background, including childhood abuse, *does not necessarily have substantial mitigating weight absent* a showing that it significantly affected or impacted the defendant's ability to perceive, comprehend, or control his actions.

*Id.* (emphasis added). In other words, when a difficult background does affect the "defendant's ability to perceive, comprehend, or control his actions," it has "substantial mitigating weight." When there is no such effect, the evidence does not necessarily have substantial mitigating weight, but it can have such weight. That is up to the sentencer's discretion.

The best McKinney can do is point to the Arizona Supreme Court's citation to *State v. Ross*, 886 P.2d 1354 (Ariz. 1994), which is a case where that court did indeed misapply *Eddings*. But that single citation is insufficient to rebut the presumption that the court knew and followed *Eddings*. In *Visciotti*, the California Supreme Court misstated the *Strickland* prejudice standard four times after stating it correctly. *Visciotti*, 537 U.S. at 22–24. If actually misstating the standard four times is insufficient to rebut the presumption that the state court applied the correct standard (*Visciotti*), then the lesser sin of citing a suspect case cannot overcome the court's correct statement of the law and the presumption it applied that law (*McKinney*). That is why we have previously held a single citation cannot be a basis for finding *Eddings* error on AEDPA review. *See Towery*, 673 F.3d at 946. Indeed, a prior en banc panel of this court rejected this exact argument in the less deferential, pre-AEDPA context. *See Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir. 1994) (en banc). As a result, we must conclude the Arizona Supreme Court's decision was not "contrary to . . . clearly established Federal law."

## 2.

I turn to the Arizona Supreme Court's conclusion that Judge Sheldon fully considered McKinney's PTSD. That is

a conclusion we review to determine whether it was an "unreasonable determination of fact" under § 2254(d)(2). *See Lopez*, 491 F.3d at 1037–38 & n.2. We are barred from characterizing the Arizona Supreme Court's "factual determination[] as unreasonable 'merely because we would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (citation omitted). "Instead, § 2254(d)(2) requires that we accord the state . . . court substantial deference." *Id.* "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199–2200 (2015) (citation omitted). If "'reasonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state court's] determination.'" *Brumfield*, 135 S. Ct. at 2277 (citation omitted).

It requires no strenuous effort to conclude that Judge Sheldon fully considered McKinney's PTSD. First, unlike the trial court judge in *Eddings*, at no point did Judge Sheldon state he was excluding the PTSD from consideration under the nonstatutory catchall as a matter of law because the PTSD had no effect on McKinney's criminal conduct. Quite the opposite. Before sentencing McKinney, Judge Sheldon stated he "consider[ed] all of the mitigating circumstances." That alone should preclude us from concluding the Arizona Supreme Court's finding was an "unreasonable determination of fact."

But even were we to indulge in de novo review of the record, that review confirms that Judge Sheldon fully considered McKinney's PTSD. Judge Sheldon's discussion of McKinney's mitigation arguments proceeded in three

steps. First, at pages 26 to 28 of the sentencing transcript, Judge Sheldon discussed the mitigation evidence McKinney proffered, specifically citing McKinney's sentencing memorandum by date. Second, at pages 28 to 31, Judge Sheldon addressed four statutory mitigating factors in Ariz. Rev. Stat. § 13-751(G), including McKinney's argument, under § 13-751(G)(1), that his PTSD affected his mental state at the time of the murders. Third, at pages 31 to 32, Judge Sheldon addressed the nonstatutory mitigating factors McKinney raised in his sentencing memorandum, including McKinney's argument for leniency under the nonstatutory catchall due to his PTSD separate from its effect on his mental state at the time of the murders.

That chronology proceeded as follows:

- At the conclusion of the evidentiary hearing, Judge Sheldon credited Dr. McMahon's testimony: "I do believe that for purposes of this hearing that some evidence of [McKinney's] possible manifestations of Post-traumatic Stress Syndrome were demonstrated by the testimony of Dr. McMahon. And I'll just—I don't know that I find it an overwhelmingly persuasive mitigating factor, but I will tell you that I'm, more inclined to believe that than Dr. Gray's determination that there is not enough evidence to assume that there is Post-traumatic Stress Syndrome." Judge Sheldon later stated Dr. McMahon's PTSD diagnosis was entitled "to more weight under the circumstances of this case."

- Judge Sheldon began his discussion of McKinney's mitigation evidence at the sentencing hearing by stating, "I have considered all the exhibits admitted

into evidence, Numbers 1 through 8." At least one of those exhibits dealt with PTSD and its effects.[27]

- Judge Sheldon again credited defense witness Dr. McMahon's testimony: "[I]t appears, and I believe that the statements made [about McKinney's childhood], both *by Dr. McMahon* and made by the witnesses at the time they were testifying, were truthful, and *I did take them into consideration in this case*." (Emphasis added.)

- Judge Sheldon then credited Dr. McMahon's testimony that McKinney's childhood led him to develop PTSD: "For whatever reasons, some of which I believe were due to the traumatic circumstances that he grew up in and the circumstances which were testified to by the witnesses during the mitigation hearing, the circumstances of child abuse, which I accept as true for purposes of this hearing, I think manifest the causal factors linked to Post-traumatic Stress Syndrome as testified to by Dr. McMahon."

After discussing an exhibit the defense proffered, Judge Sheldon turned to the statutory mitigation factors under Ariz. Rev. Stat. § 13-751(G). He first addressed McKinney's primary argument, contained in Part VIII of his sentencing memorandum, that McKinney was entitled to leniency under the statutory Mental Capacity Factor, § 13-751(G)(1) because his PTSD affected him at the time of the murders:

---

[27] The exhibits are not in the parties' excerpts of record, but they are discussed during the sentencing hearing.

- Judge Sheldon began: "[I]t appeared to me that Dr. McMahon did not at any time suggest in his testimony nor did I find any credible evidence to suggest that, even if the diagnosis of Post-traumatic Stress Syndrome were accurate in Mr. McKinney's case, that in any way significantly impaired Mr. McKinney's conduct." Judge Sheldon repeated that conclusion a page later: "[A]nd it appeared to me that based upon all these circumstances that there simply was no substantial reason to believe that even if the trauma that Mr. McKinney had suffered in childhood had contributed to an appropriate diagnosis of Post-traumatic Stress Syndrome that it in any way affected his conduct in this case."

- Judge Sheldon explained why he believed the PTSD did not affect McKinney's state of mind at the time of the murders. Namely, McKinney's pre-planning of the burglaries and homicides was inconsistent with Dr. McMahon's testimony that PTSD would cause McKinney to avoid confrontation rather than seek it out.

- Judge Sheldon then concluded leniency was not available under the Mental Capacity Factor, § 13-751(G)(1), again repeating his belief that the PTSD did not "significantly impair[]" McKinney at the time of the murders.

Judge Sheldon then addressed, and rejected, the other statutory mitigation factors.

Finally, Judge Sheldon turned to McKinney's nonstatutory mitigation factors. McKinney's sentencing

memorandum argued in two separate parts (Parts I and VII) that McKinney was entitled to leniency for his PTSD separate from any effect the PTSD had on his state of mind during the murders. Part I of the memorandum was titled: "Evidence of a Difficult Family History: *Eddings v. Oklahoma*, supra." In Part I, McKinney mentioned the childhood-caused PTSD as a mitigating factor along with his difficult childhood. The title's citation to *Eddings v. Oklahoma* brought front and center the constitutional requirement that the PTSD diagnosis be considered without restriction. Part VII of the memorandum was titled: "Psychological History." There, McKinney explained Dr. McMahon's PTSD diagnosis and stated: "Defendant submits that his psychological background is mitigating." Judge Sheldon made clear he considered both of these sections:

- Judge Sheldon started: "With respect to the other mitigating factors raised by the defense in their memorandum, defendant's mitigating memorandum received by this Court July 15th, 1993, I have had an opportunity to review that memorandum." Judge Sheldon then rejected the Part I argument that McKinney's childhood warranted leniency.

- Judge Sheldon then addressed the remaining arguments McKinney made, which included Part VII's argument that McKinney's PTSD warranted leniency: "With respect to the other matters set out in the memorandum, *I have considered them at length*, and after considering *all of the mitigating circumstances*, *the mitigating evidence that was presented* by the defense in this case as against the aggravating circumstances, and *other matters which clearly are not set forth in the statute which should be*

*considered by the court*, I have determined that . . . the mitigating circumstances simply are not sufficiently substantial to call for leniency under all of the facts of this case." (Emphasis added.)**[28]**

As the sentencing transcript shows, Judge Sheldon considered "at length" McKinney's sentencing memorandum's arguments that his PTSD diagnosis warranted leniency without any reference to PTSD's possible effect on his mental capacity during the murders. And Judge Sheldon found the PTSD did not carry enough mitigating weight "to call for leniency." When combined with Judge Sheldon's prior crediting of Dr. McMahon's testimony as to the PTSD diagnosis, the only conclusion to reach is that Judge Sheldon complied with *Eddings*. Even were there an ambiguity in Judge Sheldon's statements (there isn't), the Supreme Court has admonished that "[w]e must assume that the trial judge considered all this evidence before passing sentence. For one thing, he said he did." *Parker*, 498 U.S. at 314.**[29]**

---

**[28]** It was only in Part VIII of the sentencing memorandum that McKinney argued the causal relationship—"nexus"—between his PTSD and his criminal conduct.

**[29]** Nor was McKinney entitled to a "specific listing and discussion of each piece of mitigating evidence under federal constitutional law." *See Jeffers*, 38 F.3d at 418 ("While 'it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence,' 'due process does not require that the sentencer exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'" (citation omitted) (quoting *Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion); *Jeffries v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993))).

In short, the Arizona Supreme Court's conclusion that Judge Sheldon properly considered all of McKinney's mitigation evidence was not an "unreasonable determination of fact." In fact, it was the correct conclusion.[30]

## B. The Majority's Flawed Analysis

Perhaps because the Arizona Supreme Court was explicit in its compliance with *Eddings*, the majority takes a very different course to conclude McKinney's death sentence is invalid. The majority opinion proceeds in essentially two steps. First, it falsely paints the Arizona Supreme Court as a habitual violator of *Eddings* between 1989 and 2005. Based on that false assertion, the majority concludes the *Visciotti* presumption is automatically rebutted in this case and every other *Eddings* case coming out of Arizona within that time period. Slip op. at 7. In its place, the majority suggests the presumption is flipped and engages in a sort of de novo

---

[30] McKinney also argues the Arizona Supreme Court and Judge Sheldon failed to consider his horrific childhood in violation of *Eddings*. The majority does not address that claim, but the record makes clear that Judge Sheldon considered that evidence too. He listened to lengthy testimony about it; he mentioned it several times in his colloquy; and he expressly stated: "I agree that there was evidence of a difficult family history by the defendant. However, as I've indicated, I do not find that is a substantial mitigating factor *or* that there was any evidence that linked that in any way to demonstrate that . . . somehow significantly impaired the defendant's capacity to understand the wrongfulness of his conduct." (Emphasis added.) Just like the PTSD evidence, Judge Sheldon considered McKinney's childhood both as to its effect on McKinney at the time of the crimes and independently from any effect it may have had. The Arizona Supreme Court confirmed Judge Sheldon properly considered that evidence: "[T]he record shows that the judge gave full consideration to McKinney's childhood and the expert testimony regarding the effects of that childhood." *McKinney*, 917 P.2d at 1234.

review to see if Arizona has rebutted the presumption it violated *Eddings*, with the burden of proof as to *Eddings* compliance on the Arizona courts. *Id.* at 41–45, 50–54. Second, the majority relies on a misreading of Judge Sheldon's sentencing colloquy and the Arizona Supreme Court opinion to conclude the Arizona Supreme Court violated *Eddings* despite that court's correct articulation of *Eddings*'s requirements. *Id.* I take each mistake in turn.

1.

The majority begins by acknowledging we are required to presume state courts know and follow the law. *Id.* at 7. But it concludes we should not afford the presumption in *any* Arizona *Eddings* case because the Arizona Supreme Court—like common-law courts generally—adheres to the principle of stare decisis and "applied its unconstitutional causal nexus test consistently throughout . . . the relevant period." *Id.* at 6–7, 55–56. Though such a presumption is "appropriate in the great majority of habeas cases," the majority posits, "the presumption is rebutted here where we know, based on its own words, that the Arizona Supreme Court did not 'know and follow' federal law." *Id.* at 7. In other words, the majority relies on *other* Arizona Supreme Court cases to conclude the Arizona Supreme Court in *this* case is afforded no deference under AEDPA. Even if AEDPA permitted this type of analysis (it doesn't, and the majority cites no case in support of it), the analysis is based on a false premise. The Arizona courts did not consistently misapply *Eddings*.

The majority asserts that Arizona cases show a uniform error between 1989 and 2005. *Id.* at 26–38, 50–56. To see that assertion is wrong, one need look no further than a case the

Arizona Supreme Court decided a mere six weeks after it decided McKinney's appeal and squarely within that time period. *See State v. Towery*, 920 P.2d 290 (Ariz. 1996). There, the court cited to *Eddings* and its progeny for the proposition that "[t]he sentencer . . . *must* consider the defendant's upbringing if proffered but is not required to give it significant mitigating weight. How much weight should be given proffered mitigating factors is a matter within the sound discretion of the sentencing judge." *Id.* at 311 (applying *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (emphasis added)). The Arizona Supreme Court rejected defendant Towery's argument that the trial judge failed to comply with *Eddings* when he considered Towery's background and "gave it little or no mitigating value." *Id.* And, on habeas review of *Towery*, we concluded the Arizona Supreme Court complied with *Eddings* when it affirmed Towery's sentence. *Towery*, 673 F.3d at 944–46. In another case decided the same year as McKinney's appeal, the Arizona Supreme Court found the defendant's diagnosis of antisocial personality disorder to be a mitigating circumstance even though it did not find a nexus between that mental illness and the defendant's crime. *State v. Thornton*, 929 P.2d 676, 685–86 (Ariz. 1996) ("We agree with the trial court that Thornton's childhood, dysfunctional family, and personality disorder are mitigating factors.").

But *Towery* and *Thornton* are no outliers. A case decided a year before McKinney's appeal was decided, *see State v. Gonzales*, 892 P.2d 838, 851 (Ariz. 1995) (applying *Eddings*), and a case decided a year after it, *see State v. Trostle*, 951 P.2d 869, 885–86 (Ariz. 1997) (applying *Lockett*, *Eddings*'s precursor), confirm the Arizona Supreme Court knew how to apply *Eddings* correctly. Moreover, the Arizona Supreme Court relied on *non-nexus* mitigation evidence to *vacate* death sentences during the majority's chosen time

period, a fact our court has already recognized. *See Lopez*, 630 F.3d at 1203–04 (collecting cases for the proposition that "the Arizona Supreme Court expressly took mitigating evidence into consideration when reducing a death sentence to life, *regardless of any causal nexus to the crime*" (emphasis added)).

Still, the majority would have us believe the Arizona Supreme Court *usually* applied an unconstitutional nexus test. It provides a long string citation in an attempt to prove its point. Slip op. at 32–34. But the Arizona Supreme Court did not even apply an invalid nexus test in many of the cases the majority cites. The majority cites two cases where we have already held on habeas review that the Arizona Supreme Court did not commit *Eddings* error.[31] Indeed, as the majority recognizes, we have found there was no *Eddings* error in six additional cases during the relevant time period.[32] *Id.* at 38–39. The majority cites other cases where a federal district court has held there was no *Eddings* error and appeal is

---

[31] *See State v. Towery*, 920 P.2d 290, 310–11 (Ariz. 1996), *habeas relief denied in Towery*, 673 F.3d at 944–47; *State v. Stokley*, 898 P.2d 454, 473 (Ariz. 1995), *habeas relief denied in part in Stokley v. Ryan*, 705 F.3d 401, 404 (9th Cir. 2012) (explaining that "on balance, the Arizona Supreme Court's opinion suggests that the court did weigh and consider all the evidence presented in mitigation at sentencing").

[32] *Hedlund v. Ryan*, 750 F.3d 793, 818 (9th Cir. 2014); *Murray v. Schriro*, 746 F.3d 418, 455 (9th Cir. 2014); *Clabourne*, 745 F.3d at 371–74, *petition for rehearing and rehearing en banc pending*, No. 09-99022 (9th Cir. Mar. 18, 2014); *Poyson*, 743 F.3d at 1196–1200; *Schad*, 671 F.3d at 722–26; *Lopez*, 630 F.3d at 1203–04.

pending.[33] *Id.* at 33–34. The majority also cites cases as examples of *Eddings* error where the Arizona Supreme Court gave little weight to mitigation evidence because there was no nexus between that evidence and the murder.[34] *Id.* at 33. But giving little or no weight to such evidence as a factual matter is perfectly permissible under *Eddings*. *See, e.g.*, *Lopez*, 630 F.3d at 1204. Finally, the two cases upon which the majority most heavily relies, *State v. Djerf*, 959 P.2d 1274 (Ariz. 1998), and *State v. Hoskins*, 14 P.3d 997 (Ariz. 2000), came years after the Arizona Supreme Court affirmed McKinney's sentence. *See* slip op. at 29–32.

A close review of the majority's string cite shows that, at worst, the Arizona Supreme Court sometimes misapplied *Eddings* in the years before that court affirmed McKinney's sentence. *See, e.g.*, *Ross*, 886 P.2d at 1363; *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989). It is for that reason that we have *always* rejected the majority's conclusion that the Arizona Supreme Court consistently applied an

---

[33] *See State v. Martinez*, 999 P.2d 795 (Ariz. 2000), *habeas relief denied in Martinez v. Schriro*, No. CV-05-1561-PHX-EHC, 2008 WL 783355, at *33 (D. Ariz. Mar. 20, 2008), *appeal pending sub nom. Martinez v. Ryan*, No. 08-99009 (9th Cir. May 29, 2008); *State v. Rienhardt*, 951 P.2d 454 (Ariz. 1997), *habeas relief denied in Rienhardt v. Ryan*, 669 F. Supp. 2d 1038, 1059–60 (D. Ariz. 2009), *appeal pending*, No. 10-99000 (9th Cir. Jan. 8, 2010).

[34] *State v. Jones*, 917 P.2d 200, 219 (Ariz. 1996) ("A difficult family background is *not necessarily* a mitigating circumstance unless defendant can show that something in his background had an effect on his behavior that was beyond his control." (emphasis added)); *State v. Bible*, 858 P.2d 1152, 1209 (Ariz. 1993) ("In sum, our independent review of the record shows no *significant* mitigating evidence." (emphasis added)).

unconstitutional nexus test during this time period.[35] As a result, we have *always* rejected the argument that the Arizona Supreme Court's prior mistakes in this area are relevant to the decision before us.[36] In fact, we have specifically rejected the argument that the Arizona Supreme Court is not entitled to the *Visciotti* presumption in *Eddings* cases. *See Poyson v. Ryan*, 743 F.3d 1185, 1198 (9th Cir. 2013). The majority today overrules these precedents *sub silentio*, and concludes Arizona is not entitled to the *Visciotti* presumption because Arizona has on occasion misapplied *Eddings* before.

The majority's response to the cases involving *Eddings* compliance reveals its view of the Arizona courts: No matter what the Arizona courts say, they never *really* considered all of the mitigation evidence. *See* slip op. at 50–56. For example, we previously held in *Lopez* that Arizona complied with *Eddings* during this time period and relied in part on three cases for that conclusion. *See Lopez*, 630 F.3d at 1204 n.4 (citing *State v. Trostle*, 951 P.2d 869 (Ariz. 1997); *State v. Mann*, 934 P.2d 784 (Ariz. 1997); *State v. Medrano*, 914 P.2d 225 (Ariz. 1996)). The majority gets around those cases by disregarding the parts of the cases that show the Arizona Supreme Court quite understood and applied

---

[35] *See Poyson*, 743 F.3d at 1198; *Towery*, 673 F.3d at 946; *Lopez*, 630 F.3d at 1203–04.

[36] *See Poyson*, 743 F.3d at 1198 n.7 ("We reject the suggestion that because other Arizona cases may have involved causal nexus error we should presume that this case did as well."); *see also Clabourne*, 745 F.3d at 372–73, *petition for rehearing and rehearing en banc pending*, No. 09-99022 (9th Cir. Mar. 18, 2014); *Schad*, 671 F.3d at 723–24 (finding the Arizona Supreme Court did not apply an unconstitutional nexus test in an opinion filed eight months after the court's *Wallace* decision); *Greenway*, 653 F.3d at 807–08; *Lopez*, 630 F.3d at 1203–04.

*Eddings*'s mandate.**[37]** Slip op. at 53–54. The majority

---

[37] These cases show the Arizona Supreme Court understood that *Eddings* requires consideration of non-nexus mitigation evidence but that the sentencing court retains discretion over how much weight, if any, to afford such evidence. In *Trostle*, the Arizona Supreme Court explicitly discussed *Eddings*'s mandate and concluded, "In considering evidence of mental impairment, our primary task is to determine its mitigating weight, if any." 951 P.2d at 885–86. The court expressly considered numerous pieces of non-nexus mitigating evidence: Trostle's cooperation with the police, past drug and alcohol abuse, good conduct during trial, loving family relationships, ability to function well in a structured environment, lack of a prior felony conviction, and remorse. *Id.* at 887. The Arizona Supreme Court noted that the trial court should have considered such evidence and factored the evidence into its independent reweighing of the aggravating and mitigating factors. *Id.* at 887–88. The court reduced Trostle's death sentence to life imprisonment. *Id.* at 888.

In *Mann*, the Arizona Supreme Court reviewed four pieces of non-nexus mitigating evidence and found Mann did not "establish[] mitigation of sufficient weight to call for leniency." 934 P.2d at 795. The majority concedes that the Arizona Supreme Court considered, but gave little weight to, two pieces of non-nexus mitigating evidence: Mann's relationship with his children and a change in Mann's lifestyle post-dating his crimes. Slip op. at 53–54. The majority contends, however, that the court "held that defendant's difficult family background was irrelevant as a matter of law." *Id.* at 54. The Arizona Supreme Court did no such thing. It stated "[a]n abusive family background is *usually* given *significant weight* as a mitigating factor only when the abuse affected the defendant's behavior at the time of the crime." *Mann*, 934 P.2d at 795 (emphasis added). This statement is entirely consistent with *Eddings*: It shows the court understood it could ascribe Mann's family background the mitigating weight it deserves. *Cf. supra* Section III.A.1. The majority also contends *Mann*'s citation to *Wallace* shows the Arizona Supreme Court applied an unconstitutional causal-nexus test to Mann's evidence of a troubled family background. Slip op. at 54. However, the court also cited a case in which it did not ascribe "much weight" to the defendant's "difficult family background," which is entirely consistent with *Eddings*. *See Mann*, 934 P.2d at 795 (citing *State v. West*, 862 P.2d 192, 211–12

similarly gives short shrift to *State v. Thornton*, 929 P.2d 676 (Ariz. 1996), and *State v. Gonzales*, 892 P.2d 838 (Ariz. 1995).[38] Slip op. at 52–53.

The majority is grasping at straws. First, the majority has flipped the presumption to require us to presume the Arizona courts violated *Eddings*. No law or case is cited for this proposition. Second, those cases demonstrate compliance

---

(Ariz. 1993), *overruled on other grounds by State v. Rodriguez*, 961 P.2d 1006 (Ariz. 1998)).

In *Medrano*, the Arizona Supreme Court reviewed Medrano's cocaine use both as a statutory mitigating factor and as a nonstatutory mitigating factor. 914 P.2d at 227–29. The court found Medrano's cocaine use did not qualify as a statutory mitigating factor under Ariz. Rev. Stat. § 13-751(G)(1) because Medrano failed to prove his cocaine use significantly impaired his ability to conform his conduct to the law or appreciate the wrongfulness of his actions. *Id.* at 228. The Arizona Supreme Court acknowledged it was required to consider Medrano's cocaine use regardless any causal connection, but found Medrano's cocaine use unpersuasive as mitigating evidence. *Id.* at 229 (citing *State v. Ramirez*, 871 P.2d 237, 252 (Ariz. 1994) ("[A]lthough [courts] must consider all evidence offered in mitigation, they are not bound to accept such evidence as mitigating." (alterations in original))). The court then noted that the trial court, consistent with *Eddings*, rejected Medrano's "claim that cocaine intoxication, *under these facts*, is sufficiently mitigating to call for leniency." *Id.*; *see also id.* ("Judges are presumed to know and follow the law and to consider all relevant sentencing information before them.").

[38] The majority takes issue with *Thornton*'s citation to *Ross*, slip op. at 53, but ignores that the citation to *Ross* is for a point that is irrelevant to the majority's analysis. *See Thornton*, 929 P.2d at 686 ("Thornton argues that his cooperation with law enforcement is a mitigating factor. Thornton's admission of guilt after he was stopped and his offer to admit guilt in exchange for the state withdrawing the request for the death penalty furthered his own interest. Cooperation that is in the best interest of the accused is not a mitigating circumstance. *State v. Ross* . . . .").

with *Eddings* sufficient to rebut this newly created flipped presumption. Look at *Gonzales*. There, the Arizona Supreme Court explained that "[i]n capital sentencing proceedings, the trial court must consider the mitigating factors in [Ariz. Rev. Stat.] § 13-703(G) *as well as any aspect of the defendant's background or the offense* relevant to determining whether the death penalty is appropriate." *Gonzales*, 892 P.2d at 850 (emphasis added). The court later noted:

> From the detailed special verdict, it is clear that the trial court considered all evidence offered in mitigation. He was required to do no more. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (applying the rule in *Lockett v. Ohio* that the "sentencer in capital punishment cases must be permitted to consider any relevant mitigating factor").

*Id.* at 851. Does that not show the Arizona Supreme Court here complied with *Eddings*? What else could the court have done to overcome the majority's flipped presumption?

In short, the majority's response to those cases showing compliance with *Eddings* is nothing short of an act of contortion. *See* slip op. at 50–56. It cannot escape the fact that the Arizona Supreme Court applied *Eddings* correctly during the relevant time period. As a result, there is no reason to invert the presumption that the Arizona courts knew and followed the law into a presumption they did not.

2.

After freeing itself from the presumption that state courts know and follow the law, the majority engages in de novo review and concludes the Arizona courts here applied an unconstitutional nexus test. *Id.* at 41–45. As I have shown, even a de novo review shows there was no *Eddings* error. The majority reaches the opposite conclusion largely by selectively reading—better said, misreading—the record.

To start, the majority states that the Arizona Supreme Court accepted Judge Sheldon's conclusions, at pages 28 and 29 of the sentencing transcript, that McKinney's PTSD did not affect his state of mind at the time of the murders and, in any event, would have influenced him not to commit the murders. *Id.* at 41–45. The majority suggests this part of the sentencing colloquy "echoes" the Arizona Supreme Court's nexus test and implies these statements show the court applied a nexus test to exclude McKinney's PTSD evidence from consideration under the nonstatutory mitigation factor. *Id.* at 19–22, 41–45. But the majority admits these statements are directed to Judge Sheldon's analysis of the *statutory* mitigating factors, which, as I have explained, is the correct understanding. *Id.* at 19–20. So, even if the Arizona Supreme Court accepted Judge Sheldon's conclusion that there was no causal connection between McKinney's PTSD and the murders, there was no error.

Moreover, the majority's analysis rests on an assumption that the Arizona Supreme Court accepted a single factual finding by Judge Sheldon and ignored the rest of Judge Sheldon's sentencing colloquy. As I have already explained, the Arizona Supreme Court did not rely on any of Judge

Sheldon's factual conclusions.[39] But if the Arizona Supreme Court did accept any of Judge Sheldon's findings regarding McKinney's mitigation evidence, it accepted all of them. *See McKinney*, 917 P.2d at 1234 ("[T]he record shows that the judge gave full consideration to McKinney's childhood *and* the expert testimony regarding the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder." (emphasis added)); *id.* ("The record clearly shows that the judge considered McKinney's abusive childhood *and* its impact on his behavior *and* ability to conform his conduct." (emphasis added)).[40] The majority's selective reading of

---

[39] The Arizona Supreme Court merely reviewed whether Judge Sheldon considered all of McKinney's mitigation evidence, found "[t]he record clearly shows that the judge considered McKinney's" mitigation evidence, and concluded, "On this record there was no error." *McKinney*, 917 P.2d at 1234. It did not accept Judge Sheldon's factual findings as part of its own review of McKinney's sentence.

[40] During Hedlund's sentencing colloquy, Judge Sheldon specifically cited to *Eddings* and *Lockett v. Ohio*, 438 U.S. 586 (1978), and explained those cases required him to "weigh carefully, fairly, objectively, all of the evidence offered at sentencing, recognizing that not everyone who commits murder should be put to death." *Hedlund v. Ryan*, 750 F.3d 793, 816 (9th Cir. 2014). Judge Sheldon then considered Hedlund's alcohol abuse: "The Court has concluded that although evidence of alcohol use [is not] a mitigating circumstance under (G)(1), [it] *nevertheless should be considered as mitigating evidence*." (Emphasis added.) Judge Sheldon later reiterated that point: "The defendant's dependent personality traits, his past drug and alcohol abuse, and child abuse have been considered by the Court. If not demonstrating the existence of the mitigating factors under (G)(1), *they have nevertheless been given consideration by the Court*." (Emphasis added.) He then concluded with a discussion of Hedlund's childhood evidence: "I have considered [that evidence]. *I think it is the court's obligation to consider, whether or not it complies with the requirements in (G)(1)*." (Emphasis added.) The majority fails to explain why the Arizona Supreme Court ignored this discussion even though the

Judge Sheldon's analysis is therefore wrong on multiple levels. It is also irrelevant to the outcome of the case. That the Arizona Supreme Court may have accepted Judge Sheldon's conclusion that the evidence showed McKinney's PTSD did not affect his conduct does not show *Eddings* error. To violate *Eddings* the court must have excluded the evidence from consideration altogether because of the lack of a nexus.

The rest of the majority's evaluation of the Arizona Supreme Court's decision is just as flawed. The majority first asserts, citing *Djerf* for support, that the Arizona Supreme Court did not *really* consider McKinney's PTSD evidence even though it used the word "considering." Slip op. at 43–43. That is nonsense. The referenced case, *Djerf*, came two years after McKinney's appeal. *See Djerf*, 959 P.2d at 1274. It is irrelevant to the Arizona Supreme Court's decision in this case.

Next, the majority conclusorily asserts that the Arizona Supreme Court "recited its unconstitutional causal nexus test." Slip op. at 21, 44, 57. It did? If the Arizona Supreme Court recited a causal-nexus test, then why would the majority need so many pages to reach the conclusion that the court did, in fact, apply a causal-nexus test? It appears the majority believes the following to be an unconstitutional nexus test:

> [A] difficult family background, including childhood abuse, *does not necessarily have substantial mitigating weight absent* a showing that it significantly affected or

court reviewed Hedlund's and McKinney's death sentences in the same opinion.

> impacted the defendant's ability to perceive,
> comprehend, or control his actions.

*McKinney*, 917 P.2d at 1234 (emphasis added). Not so. As I have noted, this statement means that when a difficult background *does* affect the "defendant's ability to perceive, comprehend, or control his actions," it has "substantial mitigating weight." But when there is no such effect, the evidence does not *necessarily* have substantial mitigating weight, but it can have such weight. For that reason, I am at a loss to understand the majority's conclusion that the Arizona Supreme Court recited an unconstitutional nexus test.

Finally, the majority relies on the Arizona Supreme Court's citation to *Ross*. *See* slip op. at 42–45; *Ross*, 886 P.2d at 1363. *Visciotti* forecloses any reliance on the citation to *Ross* to find *Eddings* error.[41] But even if we looked at the Arizona Supreme Court's citation to *Ross* without the *Visciotti* presumption, we should conclude that court applied *Eddings* correctly. The court correctly stated *Eddings*'s requirements several times. *See McKinney*, 917 P.2d at 1226–27, 1234. The majority's reliance on that citation, rather than the words the Arizona Supreme Court actually used, demonstrates the majority is applying the flipped

---

[41] To that end, the majority implicitly overrules our prior en banc decision where we held a citation to a suspect case does not show the Arizona court misapplied *Eddings*. *See Jeffers*, 38 F.3d at 415.

presumption it references elsewhere in its opinion.[42] *See* slip op. at 7, 50–56.

In short, none of the reasons the majority relies on support its conclusion that the Arizona Supreme Court misapplied *Eddings*.

## IV. The Harmless-Error Analysis

The majority's final mistake comes in its harmless-error analysis.[43] Habeas petitioners "are not entitled to habeas relief

---

[42] The majority claims that a single citation to *Ross* in the Arizona Supreme Court's opinion renders the court's treatment of McKinney's mitigating evidence suspect. Slip op. at 42–45. By that logic, a citation to *Eddings*, *Lockett*, *Eddings*'s precursor, or *State v. McMurtrey*, 664 P.2d 637 (Ariz. 1983), an Arizona Supreme Court case the majority acknowledges applies *Eddings* correctly, should demonstrate compliance with *Eddings*. *See, e.g.*, *State v. Canez*, 42 P.3d 564, 593 (Ariz. 2002) (citing *Lockett* and *McMurtrey*); *State v. Sharp*, 973 P.2d 1171, 1183 (Ariz. 1999) (citing *Lockett*); *Trostle*, 951 P.2d at 885–86 (citing *Lockett* and *McMurtrey*); *Towery*, 920 P.2d at 311 n.2 (citing *Eddings* and *Lockett*); *Gonzales*, 892 P.2d at 851 (citing *Eddings*, *Lockett*, and *McMurtrey*); *Bible*, 858 P.2d at 1209 (citing *McMurtrey*); *State v. Brewer*, 826 P.2d 783, 802 (Ariz. 1992) (citing *McMurtrey*); *State v. White*, 815 P.2d 869, 889 (Ariz. 1991) (citing *Lockett*); *State v. Walton*, 769 P.2d 1017, 1034 (Ariz. 1989) (citing *Lockett*).

[43] I agree that *Eddings* error is not structural and is instead subject to harmless-error analysis, as we have already recognized. *Henry v. Ryan*, 720 F.3d 1073, 1089 (9th Cir. 2013). Indeed, most circuits have held *Eddings* error is not structural. *See Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012); *McGehee v. Norris*, 588 F.3d 1185, 1197 (8th Cir. 2009); *Ferguson v. Sec'y of Dep't of Corr.*, 580 F.3d 1183, 1201 (11th Cir. 2009); *Martini v. Hendricks*, 348 F.3d 360, 371 (3d Cir. 2003); *Bryson v. Ward*, 187 F.3d 1193, 1205–06 (10th Cir. 1999); *Boyd v. French*, 147 F.3d 319, 327–28 (4th Cir. 1998); *Williams v. Chrans*, 945 F.2d 926, 949 (7th Cir. 1991). *But see Nelson v. Quarterman*,

based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citation omitted). We can grant habeas relief only if we have "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the [sentencer's] verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (citation omitted). There must be more than a "reasonable possibility" that an error was harmful. *Brecht*, 507 U.S. at 637. Anything less puts the state to the "arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam). Here, would lack of consideration of McKinney's PTSD cause us to have "grave doubt" that Judge Sheldon would have imposed the death sentence? No.

Judge Sheldon found the prosecution established four aggravating factors, two as to each of the murders. *See* Ariz. Rev. Stat. § 13-751(F)(1), (5)–(6). First, Judge Sheldon found McKinney committed not one, but two murders, *i.e.*, the murders of Mertens and McClain. Second, he found Mertens was murdered "in an especially heinous, cruel or depraved manner." For that finding, Judge Sheldon credited testimony that McKinney admitted to his father that he shot Mertens. Judge Sheldon then explained the evidence at trial "showed that [Mertens] struggled violently to survive before being killed by a shot to the head." There were numerous "non-fatal wounds" and a "substantial amount of blood over large areas of [Mertens's] body, and the house, the bottom of her shoes, her slippers, which suggests that a struggle occurred while she was conscious." He concluded it was reasonable to

472 F.3d 287, 314 (5th Cir. 2006) (en banc) (finding *Eddings* error to be structural).

assume Mertens "suffered tremendous physical torment prior to her death." The murder was therefore "cruel." At the very least, Judge Sheldon found the "violence was gratuitous" and "clearly" unnecessary, which supported a finding that McKinney's state of mind was "heinous and depraved." Finally, Judge Sheldon found McKinney committed both murders with the expectation that they would lead to pecuniary gain. The Arizona Supreme Court did not disturb any of these findings on direct appeal. *McKinney*, 917 P.2d at 1233–34.

The majority opinion treats these aggravating factors as an afterthought. *See* slip op. at 49–50. It daintily elides a description of the facts by which the murders were committed. Yet the majority claims to have conducted a harmless-error analysis without giving the aggravating factors "short shrift." *See id.* Properly considered, these factors show the alleged failure to consider McKinney's PTSD, had it occurred, would have been harmless. As McKinney's expert admitted, there was no evidence that McKinney's PTSD affected McKinney's state of mind at the time of the murders. And Judge Sheldon found there was no link. Had Judge Sheldon not considered the PTSD diagnosis, forcing him to do so would not have altered the result. He would have given the PTSD diagnosis little weight (indeed, he did give it little weight).

The evidence of McKinney's childhood was much more compelling than his PTSD. As the majority thoroughly outlines, the evidence showed McKinney's childhood was horrible. *Id.* at 9–15. But that only bolsters the conclusion that the Arizona courts' alleged failure to consider McKinney's PTSD was harmless. If McKinney's horrific childhood was not enough to justify leniency, then why would McKinney's

resulting PTSD, which had no effect on McKinney at the time of the murders, have changed anything? I suppose it is possible that McKinney's PTSD would have nudged Judge Sheldon across the line to leniency on the supposition that "anything is possible"; but that is not the test for harmless error. "Possibility" does not mean "grave doubt" that the failure to consider the PTSD had a "substantial and injurious effect or influence in determining [his] verdict." *O'Neal*, 513 U.S. at 436. The brutal nature of the Mertens murder, the finding that McKinney committed the two murders for pecuniary gain, and the fact that McKinney had committed multiple murders all weigh heavily in favor of the death penalty. The failure to consider the marginal mitigating weight of McKinney's PTSD could not have affected the outcome. McKinney has not shown "actual prejudice," and thus any error in McKinney's sentencing was harmless.

\* \* \*

The majority's application of § 2254(d)(1) will have far-reaching effects beyond this case. Most immediately, the opinion potentially undermines every Arizona death sentence between 1989 and 2005. If we cannot find the Arizona Supreme Court complied with *Eddings* in this case, where it stated the *Eddings* standard correctly and made explicit findings that illustrate it observed *Eddings* to avoid error, then I don't quite see how future cases could come out differently. The ineluctable effect from today's majority is that, no matter what they said or did during this time period, Arizona courts violated *Eddings*. This is not idle speculation.

The majority may have already passed judgment on two cases that are currently pending appeal before our court.[44]

Most importantly, the majority's reliance on *other* Arizona Supreme Court cases will spread to all § 2254(d)(1) cases. Before today, we applied the correct standard under § 2254(d)(1). *See, e.g.*, *Elmore v. Sinclair*, 781 F.3d 1160, 1168 (9th Cir. 2015). After today, three-judge panels must abandon the correct standard and apply not the deference the Supreme Court instructs, but the majority's analysis. *See generally Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc). We will be flooded with string citations claiming to show how state appellate courts have misapplied the federal Constitution in past cases. And petitioners will rely on those cases to argue we cannot presume those courts applied the law correctly. This cannot be how AEDPA operates, which this court recognized when it previously rejected the arguments the majority revives today.

I conclude by noting that, today, we once again misapply AEDPA. But we do so only in this case. In our future cases, the Supreme Court should not presume we always misapply AEDPA because of today's decision or because of prior reversals in this area. That is, one hopes the Supreme Court will not apply a past performance test to us similar to that which the majority opinion applies to the Arizona Supreme Court.

I respectfully dissent.

---

[44] *See Martinez*, 2008 WL 783355, at *33, *appeal pending sub nom. Martinez v. Ryan*, No. 08-99009 (9th Cir. May 29, 2008); *Rienhardt*, 669 F. Supp. 2d at 1059–60, *appeal pending*, No. 10-99000 (9th Cir. Jan. 8, 2010).